UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,                          CASE NO. 2:10-cr-20005

            Plaintiff,                             HONORABLE NANCY G. EDMUNDS

-vs-

D-1    UMAR FAROUK ABDULMUTALLAB,

            Defendant.

_____/

UNITED STATES' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION
TO SUPPRESS HOSPITAL STATEMENT (R.55) AND RESPONSE TO MOTION
TO SUPPRESS STATEMENTS MADE TO GOVERNMENT AGENTS
AT THE MILAN CORRECTIONAL FACILITY (R.59)

INTRODUCTION

Defendant seeks to suppress the statement he made to FBI agents on December 25, 2009, at the University of Michigan Hospital, where he was being treated for burns immediately following his attempt to destroy a commercial airliner and kill the people aboard.  See R.55: Motion to Suppress Statements Made at the University of Michigan Hospital.[1]  Defendant claims that his statement should be suppressed as involuntary, and also because he was not advised of *Miranda* rights prior to giving the statement.

Defendant's motion should be denied.  Defendant's statement was not the result of law

_____

[1] Defendant's motion also seeks to suppress an additional statement, made informally to a Customs and Border Protection officer who was guarding him later on the night of December 25, 2009.  *See* R.55, ¶ 21.  The government will not seek to offer that statement at trial. Defendant also filed a separate motion to suppress statements made to agents on other dates. R.59: Motion to Suppress Statements Made to Government Agents at the Milan Correctional Facility.  The government will not seek to offer those statements at trial either, and therefore that motion should be denied as moot.

enforcement coercion, and thus was voluntary as a matter of law.  In addition, the agents who interviewed him were not required to provide *Miranda* warnings in view of *New York v. Quarles*, 467 U.S. 649 (1984), as the situation involved a true public safety exigency.   The authorities had no prior knowledge of the defendant's attack; indeed, the aircrew and responding law enforcement officers initially believed someone had set off a firecracker on board the aircraft.  This was a highly fluid situation. Once it became clear to the agents that what was underway was in fact an act of terrorism that could have been part of a coordinated, multi-pronged attack similar to 9/11, it was lawful and wholly appropriate for the agents to ask questions intended to respond to the imminent threat to public safety posed by the defendant and any possible confederates or co-conspirators, prior to advising defendant of his *Miranda* rights.

On Christmas Day, December 25, 2009, defendant arrived at Detroit Metropolitan Airport aboard Northwest-Delta Flight 253 from Amsterdam, the Netherlands.  Approximately seven minutes before landing, he detonated an explosive device concealed in his underwear, causing a loud, popping noise similar to the sound of a firecracker, and igniting a fire aboard the aircraft. Defendant was severely burned.  Minutes after the fire was extinguished by flight attendants and defendant was subdued by the flight crew and passengers, the pilots radioed the control tower to request that law enforcement authorities meet the plane at the gate.

Customs and Border Protection officers, having been advised of an incident involving firecrackers on board the plane, responded to the gate.  However, they quickly determined that defendant's burns were far too extensive to have been caused by firecrackers.  Instead, defendant told the officers  that he had detonated an explosive device hidden in his underwear, and that he had been acting on behalf of al-Qaeda.  The officers immediately arranged to have defendant transported

to the University of Michigan Hospital for treatment, and informed the FBI's Joint Terrorism Task Force of the situation.  At the hospital, defendant received treatment for his burns, including 50 micrograms of the painkiller fentanyl.

The FBI agents who arrived at the hospital decided to interview defendant as soon as his medical treatment was completed and after doctors said he was able.  The agents who interviewed the defendant were aware that he earlier claimed to be acting on behalf of al-Qaeda.  The agents were also well aware that on September 11, 2001, al-Qaeda operatives hijacked four airplanes in an attack on our country that killed almost 3,000 people.  Mindful of defendant's self-proclaimed association with al-Qaeda and knowing that group's past history of large, coordinated plots and attacks, the agents feared that there could be additional, imminent aircraft attacks in the United States and elsewhere in the world.  The agents also confirmed with medical staff that the fentanyl defendant had received would not render  him uncommunicative or unable to understand them; in fact, the defendant's receipt of drugs was intended by medical staff to be "conscious sedation," which by definition wears off quickly and does not interfere with the ability to communicate.

After defendant was removed from the aircraft, transferred to the hospital, and received medical care, defendant spoke freely to the FBI agents for about fifty minutes.  The interview took place about three and one-half hours after the plane landed, but only about two hours after Joint Terrorism Task Force agents learned defendant's identity.  The agents limited their questions to matters involving the public safety.  They asked him where he had traveled, when he had traveled, how, and with whom; the details of the explosive device; the details regarding the bomb-maker, including where defendant had received the bomb; his intentions in attacking Flight 253; who else might be planning an attack; and how and when he had become radicalized.  Every question was

directly related to identifying any other attackers and preventing another potential attack. Defendant answered, providing details of his mission, training, and radicalization, including his decision months earlier to become involved in violent jihad.  Defendant also provided information about the construction of the explosive device he had been carrying, and that he had intended to cause Flight 253 to crash, killing all persons on board.  These responses helped the agents to determine who else might be planning or carrying out a bombing.  At the end of the interview, once they received the public safety information, the agents turned their attention to  immediately sharing the information with law enforcement and intelligence agencies worldwide.

Defendant has been indicted on numerous terrorism charges, including Conspiracy to Commit an Act of Terrorism Transcending National Boundaries, in violation of 18 U.S.C. §§ 2332b(a)(1) and 2332b(a)(2); Attempted Murder, in violation of 18 U.S.C. § 1113 and 49 U.S.C. § 46506; and Attempted Use of a Weapon of Mass Destruction, in violation of 18 U.S.C. § 2332a(a)(2).

<u>ARGUMENT</u>

A. DEFENDANT'S STATEMENT TO FBI AGENTS WAS VOLUNTARY

1. The Fact That Defendant Had Received A Painkiller Does Not, In And Of Itself, Render His Statement Involuntary; Defendant Must Nevertheless Demonstrate Law Enforcement Coercion, Which Did Not Take Place In This Case.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  The use of an involuntary statement as evidence at a defendant's trial therefore is barred by the Fifth Amendment's Due Process clause. *Chavez v. Martinez*, 538 U.S. 760, 770 (2003).  Nevertheless, the Fifth Amendment does not prohibit all incriminating admissions; "[a]bsent some officially coerced self-accusation, the Fifth

4

Amendment privilege is not violated by even the most damning admissions." *United States v. Washington*, 431 U.S. 181, 187 (1977).

It is well-established that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause[.]" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). In *Connelly*, the defendant, who had a history of mental illness, approached a police officer and spontaneously confessed to a murder. The defendant also pointed out to officers the location where the crime had occurred. The trial court found, based on that evidence, "that the police had done nothing wrong or coercive in securing" Connelly's confession, *id*. at 162, but nevertheless suppressed his statements.

The Supreme Court reversed, holding that "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Connelly*, 479 U.S. at 164. Although a defendant's mental condition is a significant factor in the voluntariness calculus, this alone "does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Id*. Thus, as the Sixth Circuit has observed, the word "involuntary" is a term of art in this context: "As applied to confessions and for purposes of due process, then, the term 'involuntary' should be construed to refer not to some *property* a defendant's confession may be said in itself to have or lack, but rather to a certain *relation* between the confession and the method or conduct of law enforcement officials in procuring it." *United States v. Newman*, 889 F.2d 88, 95 n.3 (6th Cir. 1989) (emphasis in original).

Because, contrary to defendant's apparent position, police conduct rising to coercion must

5

be causally related to the defendant's statement before the statement can be deemed involuntary under the Due Process Clause, the fact that the defendant here was administered pain killers at a doctor's direction cannot, in and of itself, render his confession involuntary.  There was no law enforcement coercion involved in his giving the statement.  The medication was administered by medical staff for medical reasons, without input from the FBI.  Defendant does not even allege (and it is not the case) that law enforcement authorities manipulated the administration of the drugs in order to facilitate the taking of a statement.

    To the government's knowledge, every court of appeals to have addressed the issue has found that a defendant's mere ingestion of drugs (whether pursuant to doctors' orders or otherwise) does not, in and of itself, render the defendant's statements involuntary.  For example, in *United States v. Short*, 947 F.2d 1445 (10th Cir. 1991), the defendant had both arms in casts, and was taking prescription painkillers (percodan and hydracodeine) at a doctor's direction when he gave a statement.  *Id*. at 1448.  The Court found that the statement was voluntary because "[d]efendant's pain was not so great, nor was his mind so clouded by pain pills that he was unable to think and converse with the police freely and intelligently on several subjects. . . .  Defendant's will *was not overborne by the police*."  *Id*. at 1450 (citations omitted) (emphasis added).  *See also Nickel v. Hannigan*, 97 F.3d 403, 410 (10th Cir. 1996) (holding that even if mental incapacity such as by drug ingestion requires a lesser showing of coercion, "for a confession to be involuntary, 'the police must somehow overreach by exploiting a weakness or condition known to exist'") (citation omitted).

    In *United States v. Martin*, 781 F.2d 671 (9th Cir. 1985),  the defendant had been hospitalized due to injuries caused by the explosives in which he was dealing, and received a painkiller (demerol) from medical staff.  *Id*. at 672-73.  The Court held that his statements were

6

voluntary, because the defendant

> was awake and relatively coherent during the questioning at the hospital. He sat up in his bed and spoke freely with Detective Schindler and Agent Galyan. When Martin became too groggy to understand the detective's questions, Detective Schindler terminated the interview. There is no evidence of extended and oppressive questioning. Nor had Martin received excessive quantities or unusual combinations of drugs. Martin's injuries, while painful, did not render him unconscious or comatose. Moreover, Martin said that he wanted to talk to the officers and was not reluctant to tell his story. The district court properly concluded that "although the defendant was injured and under medical care at the time the statements were made, the type, dosage, and schedule of painkilling narcotic administered to [Martin] was not sufficient to overbear his will to resist the questioning or impair his rational faculties."

*Id.* at 674.

In *Wolfrath v. LaVallee*, 576 F.2d 965 (2d Cir. 1978), the defendant had been admitted to the hospital for a gunshot wound, which he said he had received as a result of being a crime victim. Prior to surgery to remove the bullet, he had been administered morphine, demerol, and luminal, *id.* at 968-70, and was interviewed by police, who had learned new information suggesting in fact that he had been involved in a robbery. *Id.* at 967-68. Less than four hours after receiving the drugs, the defendant was interviewed and confessed. The district court held that the defendant's statement was involuntary, based on medical testimony that a person having received such medications would be in a "'fugue-like state'" and the drugs "would induce a euphoric feeling of invulnerability . . . [and a] person in such a state is not capable of making a serious decision." *Id.* at 971.

The Second Circuit reversed, finding that involuntariness cannot "be decided solely by reference to the general properties of those drugs." *Wolfrath*, 567 F.2d at 972. Rather,

> the voluntariness of the confession must be judged under the totality of the circumstances. In determining that Wolfrath did not show that his will was overborne, we are particularly struck with the fact that, unlike most confession cases brought before the courts, the present case, in our view, involves no question of impermissible police tactics. . . . [B]ecause there was no element of improper police tactics, because the evidence was uncontradicted that Wolfrath's condition, though perhaps weakened by his ordeal, was nonetheless strong and that he was alert and responsive, we hold that Wolfrath failed to substantiate his claim that the admission into evidence of his St. Vincent's [Hospital] confession denied him due process of law.

*Id*. at 973.

The Sixth Circuit is no exception. It fully endorses the proposition that being under the influence of drugs, or any other mental factor, is not a basis for suppression of the defendant's statement absent a finding of police misconduct. *See, e.g.*, *United States v. Chapman*, 112 Fed. Appx. 469, 474 (6th Cir. 2004) (The defendant "does not argue that the police coerced him in any way, only that his heroin-befuddled state made him unduly frightened of them. But 'coercive police activity is a necessary predicate to the finding that a confession was not 'voluntary.'"). Indeed, the Sixth Circuit has explained that "[e]vidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989) (citing *Connelly*, 479 U.S. 157; *McCall v. Dutton,* 863 F.2d 454 (6th Cir. 1988)).

8

2. Because Defendant Neither Alleges Nor Can Demonstrate Any Coercive Law Enforcement Activity, His Statement Is Admissible.

"Threshold to the determination that a confession was 'involuntary' for due process purposes is the requirement that the police 'extorted [the confession] from the accused by means of coercive activity.' Once it is established that the police activity was objectively coercive, it is necessary to examine [a defendant's] subjective state of mind to determine whether the 'coercion' in question was sufficient to overbear the will of the accused. [P]etitioner must prove that his will was overborne *because* of the coercive police activity in question. If the police misconduct at issue was not the 'crucial motivating factor' behind petitioner's decision to confess, the confession may not be suppressed." *McCall*, 863 F.2d at 459 (citations omitted); *cf. United States v. Rutherford*, 555 F.3d 190, 195 (6th Cir. 2009) (citations omitted) (factors to consider are whether "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement").

"In determining whether a confession has been elicited by means that are unconstitutional, this court looks to the totality of the circumstances concerning 'whether a defendant's will was overborne in a particular case.' Relevant factors may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *United States v. Mahan*, 190 F.3d 416, 422-23 (6th Cir. 1999) (citation omitted).

At a hearing, the government expects that it will be able to prove that defendant, who was an adult, was a graduate of a number of prestigious and demanding preparatory schools and

9

universities, including the British School of Lome; had graduated from the University College of London in the United Kingdom, with a degree in Engineering; and had been enrolled in a post-graduate program at the University of Wollongong in Dubai, United Arab Emirates.  Defendant was a sophisticated international traveler, having been on his own throughout the world, including Ghana, Yemen, the United Kingdom, the United Arab Emirates, Saudi Arabia, and two previous trips to the United States.  The FBI agents who questioned defendant made no threats, displayed no weapons, and offered no promises or inducements.  Defendant had been provided immediate medical care, and had not been deprived of food or sleep.  In short, the agents' conduct was not coercive.

Defendant asserts that *Mincey v. Arizona*, 437 U.S. 385 (1978), is controlling and requires suppression of the interview statement in issue.  He is incorrect.  The facts of this case are plainly distinct from *Mincey* and, in any event, as discussed below, exclusion would be an inappropriate remedy.  In *Mincey*, the defendant had been seriously injured in an armed confrontation with the police during which he killed an officer.  *Id.* at 387.  Immediately following the shoot out, the defendant was transported to a hospital emergency room for treatment.  *Id.* at 396.  That evening in the hospital, the defendant was informed that he was under arrest, read his *Miranda* rights, and interrogated by a detective for approximately four hours.  *Id.*  Because the defendant was intubated, he wrote his answers on pieces of paper provided by the hospital.  *Id.*

The Supreme Court excluded the defendant's interrogation statements, finding that they were not "the product of a rational intellect and a free will."  *Mincey*, 437 US at 398 (citations omitted).

10

The Court focused on the defendant's condition during the interrogation, observing as follows:

> [Mincey] had been seriously wounded just a few hours earlier, and had arrived at the hospital "depressed almost to the point of coma," according to his attending physician. Although he had received some treatment, his condition at the time of [the detective's] interrogation was still sufficiently serious that he was in the intensive care unit. He complained to [the detective] that the pain in his leg was "unbearable." He was evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation, since some of his written answers were on their face not entirely coherent. Finally, while Mincey was being questioned he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus.

*Id.* at 398-99.

The *Mincey* Court additionally observed that the defendant told the detective repeatedly that he did not wish to be interrogated further without the assistance of an attorney. 437 U.S. at 399-401. The detective only paused the interrogation when the defendant lost consciousness or received treatment. *Id.* at 401. In sum, looking at all the circumstances together, the Court found that the defendant's "will was simply overborne." *Id.* at 401-02.

This case is readily distinguishable from *Mincey*. Here, defendant did not tell the officers (much less repeatedly) that he did not wish to speak to them. The interview was not conducted while defendant was undergoing medical treatment, defendant was not in a comatose state, and he never lost consciousness. To the contrary, as noted above, defendant spoke freely to the agents for the duration of the interview, which began only when defendant's emergency medical treatment was completed, and lasted for approximately fifty minutes (not four hours, as in *Mincey*). Moreover, the agents limited their questions to matters involving public safety and preventing other possible imminent terrorist attacks. *See New York v. Quarles*, 467 U.S. at 658-59 ("police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect");

11

*cf. Michigan v. Bryant*, 131 S. Ct. 1143, 1157 (2011) (overturning lower court's exclusion of evidence based on an alleged Confrontation Clause violation, stating that "[t]he existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than prov[ing] past events potentially relevant to later criminal prosecution") (citation omitted); *id.* at 1156 n.7, 1160 n.10, 1161 (citing *Quarles* and public-safety exception to *Miranda*). *Mincey*, accordingly, is not controlling.

      3.   Because There Was No Law Enforcement
           Misconduct, Suppression Of Defendant's Statement
           Is Prohibited As A Matter Of Law.

"The purpose of excluding evidence seized in violation of the Constitution is to substantially deter future violations of the Constitution." *Connelly*, 479 U.S. at 166. In *Connelly*, because defendant spontaneously confessed due to mental illness, and because the lower court had found that the officers had "done nothing wrong," *id.* at 162, the Supreme Court held "[o]nly if we were to establish a brand new constitutional right – the right of a criminal defendant to confess to his crime only when totally rational and properly motivated – could respondent's present claim be sustained." *Id.* at 166. The Court concluded that "suppressing respondent's statements would serve absolutely no purpose in enforcing constitutional guarantees." *Id.*

      Similarly, in the present case, Joint Terrorism Task Force agents immediately recognized the possible threat to public safety, of which defendant might have been only one piece. The agents knew that al-Qaeda had a history of large, coordinated attacks, including attacks using aircraft. In light of this fact, it was perfectly reasonable -- indeed incumbent upon them -- to ascertain immediately what the defendant knew. Their questions were limited to obtaining information relevant to the public safety threat, including where he had traveled, when he had traveled, how, and

with whom; the details of the explosive device; the details regarding the bomb-maker, including where defendant had received the bomb; his intentions in attacking Flight 253; who else might be planning an attack; and how and when he had become radicalized.  As the Supreme Court recently observed in the Fourth Amendment context, "[a]bout all that exclusion would deter in this case is conscientious police work."  *Davis v. United States*,131 S. Ct. 2419, 2429 (2011).

*Miranda* does not require otherwise.  *Miranda* protects the voluntariness of confessions with a "set of prophylactic measures" that serve to safeguard against the "'inherently compelling pressures' of custodial interrogation."  *Maryland v. Shatzer*, 130 S. Ct. 1213, 1210 (2010) (quoting *Miranda*, 384 U.S. at 467).  As Justice Kennedy explained in his controlling concurrence in *Missouri v. Seibert,* 542 U.S. 600 (2004) (plurality), "not every violation of the [*Miranda*] rule requires suppression of the evidence obtained."  *Id*. at 618.  Indeed, the Supreme Court has repeatedly found that *Miranda*'s prophylactic measures may be accommodated to other objectives of the criminal justice system when admission of the defendant's unwarned inculpatory statements is unlikely to implicate *Miranda*'s central concern of protecting the voluntariness of confessions, and when other objectives of the criminal justice system are best served by the admission of the statements.  For instance, the Court has found that statements obtained in violation of *Miranda* can be used for impeachment, so that the truth-finding function of the trial is not distorted by the defense.  *See Harris v. New York*, 401 U.S. 222 (1971).  The Court has also held that physical evidence obtained in reliance on statements taken in violation of the rule is admissible.  *See United States v. Patane*, 542 U.S. 630 (2004).  Likewise, as discussed below in greater detail, the Court has held that there is a *Miranda* exception to protect countervailing concerns of public safety.  *See Quarles*, 467 U.S. at  656 (holding that in a "kaleidoscopic situation . . . where spontaneity rather

13

than adherence to a police manual is necessarily the order of the day," officers need not read a suspect his *Miranda* rights prior to asking questions reasonably prompted by a concern for public safety).

In this case, *Miranda*'s core concern to protect voluntariness is not implicated. As discussed, the FBI agents did not employ coercive or otherwise offensive tactics to pressure defendant to confess to a crime. Rather, they responded in an appropriate fashion to a credible and potentially evolving terrorist threat by attempting to ascertain the level of danger to the United States. Defendant, an educated, well-traveled man, spoke freely to them, acknowledging his connection to al-Qaeda, an organization that has engaged in coordinated attacks involving aircraft, as well as acknowledging his intention to kill the passengers aboard his flight with an explosive device. Suppression in these circumstances would not serve *Miranda*'s objectives.

B.  AGENTS WERE NOT REQUIRED TO ADVISE DEFENDANT
     OF HIS *MIRANDA* RIGHTS BASED ON THE "PUBLIC SAFETY"
     EXCEPTION OF *NEW YORK v. QUARLES*

Defendant asserts that his statement to FBI agents should be suppressed because he was not given the advice of rights provided for by *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant's motion should be denied, because his interview, under the circumstances presented, was justified by the public safety exception to *Miranda* recognized by the Supreme Court in *Quarles*, 467 U.S. at 657, in which the Court found that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *See United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001) (applying *Quarles* to unwarned response to officers' question about the location of a firearm in a house where, *inter alia*, "[t]he individuals in the house did not open the door for nearly thirty minutes after the

14

initial knock by the officers").

The full facts of *Quarles* are as follows.  On September 11, 1980, at approximately 12:30 a.m., Officer Frank Kraft and Officer Sal Scarring were on road patrol in Queens, New York, when a young woman approached their car. She told them that she had just been raped by a black male, approximately six feet tall, who was wearing a black jacket with the name "Big Ben" printed in yellow letters on the back.  She told the officers that the man had entered an A&P supermarket located nearby and that the man was carrying a gun.  467 U.S. at 651-52.

The officers drove the woman to the supermarket, and Officer Kraft entered the store while Officer Scarring radioed for assistance.  Officer Kraft quickly spotted Quarles, who matched the description given by the woman, approaching a checkout counter.  Apparently upon seeing the officer, Quarles turned and ran toward the rear of the store, and Officer Kraft pursued him with a drawn gun. When Quarles turned the corner at the end of an aisle, Officer Kraft lost sight of him for several seconds, and upon regaining sight of Quarles, Office Kraft ordered him to stop and put his hands over his head.  *Quarles*, 467 U.S. at 652.

Although more than three other officers had arrived on the scene by that time, Officer Kraft was the first to reach Quarles.  He frisked Quarles and discovered that Quarles was wearing a shoulder holster, which was then empty.  After handcuffing him, Officer Kraft asked him where the gun was.  Quarles nodded in the direction of some empty cartons and responded, "the gun is over there."  Officer Kraft thereafter retrieved a loaded .38-caliber revolver from one of the cartons, formally placed Quarles under arrest, and read him his *Miranda* rights from a printed card.  Quarles indicated that he would be willing to answer questions without an attorney present.  Officer Kraft then asked Quarles if he owned the gun and, if so, where he had purchased it.  Quarles answered that

15

he did own it and that he had purchased it in Miami, Fla. *Quarles*, 467 U.S. at 652.

Quarles moved to suppress his statement to the arresting officer, as well as the gun which had been seized. *Quarles*, 467 U.S. at 652-53. The New York courts suppressed the evidence, but the Supreme Court reversed, finding that "there are limited circumstances where the judicially imposed strictures of *Miranda* are inapplicable." *Id*. at 653 n.3.

The Court began its analysis by noting that "[i]n this case we have before us no claim that respondent's statements were actually compelled by police conduct which overcame his will to resist." *Quarles*, 467 U.S. at 654. "[W]e do not believe that the doctrinal underpinnings of *Miranda* require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety." *Id*. at 656. "So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it." *Id*. at 657. The Court continued:

> In such a situation, if the police are required to recite the familiar *Miranda* warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding. Procedural safeguards which deter a suspect from responding were deemed acceptable in *Miranda* in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the *Miranda* majority was willing to bear that cost. Here, had *Miranda* warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area.

*Id*.

In further elaborating on the balancing of the social costs and benefits, the Court stated, "[w]e

16

decline to place officers such as Officer Kraft in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them." *Id*. at 657-658.

In the present case, FBI Joint Terrorism Task Force agents faced an even more compelling situation than that addressed by the *Quarles* Court, and thus the agents plainly faced the necessity of making a quick decision to neutralize the potentially "volatile situation confronting them." *Quarles*, 467 U.S. at 658. Agents knew from Customs and Border Protection officers that defendant had admitted to having detonated an explosive device on board the aircraft, and that he had admitted to being an al-Qaeda member. The agents were well aware of al-Qaeda's history of large, coordinated terrorist attacks, especially attacks on multiple aircraft, and questioned defendant to determine the extent of any such threat. If the threat to public safety presented by Benjamin Quarles as a lone actor with a single gun justified questioning him without *Miranda* warnings, as the Supreme Court determined it did, then the present case certainly justified such questioning, as there were possibly numerous additional aircraft bombing plots going forward that same Christmas Day, potentially endangering thousands of lives.

The facts of the present case are different from those in *Quarles*, but as the Second Circuit has expressly recognized, the logic of *Quarles* extends to the questioning of terrorism suspects. In *United States v. Khalil*, 214 F.3d 111 (2d Cir. 2000), for example, the defendant was a pipe-bomb maker who had been shot and wounded by the police during a raid of his apartment. *Id*. at 115. The

17

police took him to the hospital for medical care, and later that morning questioned him about the construction and stability of the pipe bombs. They did not provide *Miranda* warnings. *Id*. at 121. Specifically, the police asked the defendant whether he intended to kill himself in detonating the bombs, and he responded simply, "Poof." *Id*. at 115.

The court of appeals in *Khalil* affirmed the district court's finding that the defendant's response was made voluntarily and knowingly. The court of appeals found that, although the defendant was in pain when he answered "Poof," he was nonetheless alert, seemed to understand the officers' questions, and gave responsive answers. In so finding, however, the court of appeals also indicated that the *Quarles* public safety exception was applicable. *Khalil*, 214 F.3d at 121-22. The court of appeals stated that it was "inclined to disagree" with the defendant's contention that his response was unrelated to public safety, observing that the defendant's "vision as to whether or not he would survive his attempt to detonate the bomb had the potential for shedding light on the bomb's stability" *id.* at 121, and thus its danger to officers and the public. *See also In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 203-04 & n.19 (2d Cir. 2008) (assuming *Quarles* would apply to exigent circumstances in a terrorism case).

The same holds true here. The agents' questions were intended to shed light on the obvious public safety concerns in issue. An evidentiary hearing will demonstrate that the agents limited their questions to defendant to "questions necessary to secure . . . the safety of the public[.]" *Quarles*, 467 U.S. at 659. The agents asked defendant where he had traveled, when he had traveled, how, and with whom; the details of the explosive device; the details regarding the bomb-maker, including where defendant had received the bomb; his intentions in attacking Flight 253; who else might be planning an attack; and how and when he had become radicalized. All such questions were either directly

18

related to other potentially imminent attacks, or were intended to elicit information which could be used in conjunction with other U.S. government information to identify and disrupt such imminent attacks before they could occur. The agents did not pose questions "designed solely to elicit testimonial evidence from a suspect," *id*. at 659, and limited their questioning to approximately fifty minutes, at which time they had sufficient information to address the threat to public safety. *Cf. United States v. Carrillo*, 16 F.3d 1046, 1049 (9th Cir. 1994) (applying public safety exception to response to arresting officer's question about presence of drugs or needles on defendant's person, noting the non-investigatory nature of the officer's question). The agents then concluded their interview and immediately passed that information on to other law enforcement and intelligence agencies worldwide, further underscoring that it was obtained for purposes of public safety, to deal with other possible threats. Accordingly, even if the Court were to find *Miranda* applicable, the *Quarles* public safety exception applies to defendant's statement.

19

CONCLUSION

For the foregoing reasons, the Court should conduct an evidentiary hearing, and deny

defendant's motion to suppress the statement he made to FBI agents at the University of Michigan

Hospital on December 25, 2009.

Respectfully submitted,

BARBARA L. McQUADE
United States Attorney,
Eastern District of Michigan

s/ Jonathan Tukel                                        s/Cathleen M. Corken
Assistant U.S. Attorney                              Assistant U.S. Attorney
Chief, National Security Unit                     211 West Fort Street, Suite 2001
211 West Fort Street, Suite 2001               Detroit, Michigan 48226
Detroit, Michigan 48226                            Phone: (313) 226-0206
Phone: (313) 226-9749                             Email: Cathleen.Corken@usdoj.gov
Email: Jonathan.Tukel@usdoj.gov

s/ Michael C. Martin
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
Phone: (313) 226-9670
Email: Michael.C.Martin@usdoj.gov

Dated: August 26, 2011

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 26, 2011, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to Anthony Chambers.  I further certify that I have caused a copy of this filing to be delivered and mailed to the defendant, Umar Farouk Abdulmutallab, Register No. 44107-039, Federal Detention Center, East Arkona Road Milan, Michigan.

<u>s/ Lindsay Black</u>
Legal Assistant
U.S. Attorney's Office