# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,
          Plaintiff,

                                        CRIMINAL NO.  2:10-CR-20005
                                        HONORABLE NANCY G. EDMUNDS

v.

D-1, UMAR FAROUK ABDULMUTALLAB,
          Defendant.
_____/

## DEFENDANT'S REPLY TO THE GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS HOSPITAL STATEMENT

On August 5, 2011, Defendant ABDULMUTALLAB field a Motion to Suppress Statements Made at the University of Michigan Hospital. (Doc. #55). The Government responded on August 26, 2011. (Doc. #84). The Government says: (1) Defendant ABDULMUTALLAB's statements were voluntary; and (2) the agents were not required to read Defendant ABDULMUTALLAB'S *Miranda* rights because there was a "true public safety exigency."

On December 25, 2009, Defendant UMAR FAROUK ABDULMUTALLAB ("Defendant ABDULMUTALLAB") was being treated by physicians at the University of Michigan Hospital. To reduce the pain, physicians had to give Defendant ABDULMUTALLAB 300 mg of fentanyl - not 50 mg that the Government claims Defendant ABDULMUTALLAB received. *See* FBI 302 dated 12/26/2009.

Federal agents responded to the hospital and consulted with hospital staff regarding the status of Defendant ABDULMUTALLAB's burns. Contrary to the government's position that the agents did not interview Defendant ABDULMUTALLAB until after doctors said he was able

to be interviewed, what truly happened is that hospital staff advised the agents that Defendant

ABDULMUTALLAB could not be interviewed immediately. Hospital staff were direct and

clear when advising federal agents that Defendant ABDULMUTALLAB could not be legally

interviewed for four to six hours after administering the fentanyl. *See* FBI 302 dated 12/26/2009.

Federal agents took full advantage of Defendant ABDULMUTALLAB's limited state of

mind caused by the 300 mg of fentanyl. They bypassed the hospital staff's advice, violated

Defendant ABDULMUTALLAB's constitutional rights, and interviewed him knowing he was

heavily sedated and semiconscious.

## ARGUMENT

**I.    THE FEDERAL AGENTS CONDUCT OF INTERVIEWING
DEFENDANT ABDULMUTALLAB WHILE HE WAS
HEAVILY SEDATED AND SEMICONSCIOUS CONSTITUTES COERCIVE
POLICE ACTIVITY THAT RENDERS HIS STATEMENTS INVOLUNTARY**

The government's position is that the Court cannot suppress Defendant

ABDULMUTALLAB's statements as involuntary because they were provided without any law

enforcement coercion. The government attempts to downplay the fact that Defendant

ABDULMUTALLAB was heavily sedated and semiconscious when he was interviewed by the

federal agents and made the statements.

Both the United States Supreme Court and the Sixth Circuit Court of Appeals would

answer affirmatively to the question of whether Defendant ABDULMUTALLAB's statements

were given involuntarily as a result of police coercion. According to the Sixth Circuit,

voluntariness of a statement is determined by looking at the totality of circumstances. *See United*

*States v. Rutherford,* 555 F.3d 190, 195 (6th Cir. 2009) (citing *Colorado v. Connelly,* 479 U.S.

157, 166 (1986)); *see also Mincey v. Arizona,* 437 U.S. 385, 401 (1978) (the determination of

2

whether a statement is involuntary requires careful evaluation of all the circumstances of the interrogation) (citing *Boulden v. Holman*, 394 U.S. 478, 480 (1969)). The totality of the circumstances can include such factors as "age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep." *McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir. 2006) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

In addition, the Court should consider whether "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *Rutherford*, 555 F.3d at 195 (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).

When the interview was conducted, Defendant ABDULMUTALLAB was a fearful young man who was unfamiliar with the laws of the United States, and who was isolated from family, friends, and legal counsel. He was laying in an hospital bed with third-degree burns to his body, sedated, semiconscious, and surrounded by an unknown numbers of federal agents, including U.S. Customs and Border Protection Officers and Immigration and Customs Enforcement Agents. Regardless of the number of degrees Defendant ABDULMUTALLAB has received, his education could not help him at that point in time.

In addition, Defendant ABDULMUTALLAB did not receive his *Miranda* rights. He was interviewed for approximately 50 minutes, and he was interviewed immediately after being given medication by hospital staff that literally rendered him incapable of voluntarily submitting a statement.

3

It is without question that the federal agents' conduct of interviewing Defendant ABDULMUTALLAB -- when the hospital staff clearly told them he could not be interviewed for another four to six hours because his will was overborne by the pain medication -- constitutes coercive activity that was sufficient to overbear Defendant ABDULMUTALLAB's will, and that this conduct was a crucial motivating factor in his decision to provide the incriminating statements. Defendant ABDULMUTALLAB lacked the cognitive ability to terminate the questioning, and to know when to refuse to answer the questions.

Indeed, the Court need not look further than *Mincey* - a controlling case from the United States Supreme Court -- to reach the conclusion that Defendant ABDULMUTALLAB's statements were involuntary. The government's position that this case is "readily distinguishable" from *Mincey* is absurd.

In *Mincey*, the defendant was taken to the intensive care unit of the hospital where he was interrogated by a detective of the Tucson Police Department. *Mincey*, 437 U.S. at 396. At the time of the interview, defendant was seriously wounded; he had arrived at the hospital "depressed almost to the point of coma"; he was in "unbearable" pain; he was confused and unable to think clearly. *Id.* at 398-99. The Supreme Court held that defendant's statements could not be used against him, considering at the time he was heavily sedated and under immense pain. *Id.* at 401-02.

Similarly, Defendant ABDULMUTALLAB was seriously wounded -- he suffered third-degree burns to his body. When he arrived at the hospital, the hospital staff sedated him with 300 mg of fentanyl, which made him semiconscious. In addition, Defendant ABDULMUTALLAB and the Defendant in *Mincey* were in the intensive care unit. Defendant ABDULMUTALLAB and the Defendant in *Mincey* were still in a state of shock when they were

4

interrogated. Defendant ABDULMUTALLAB and the Defendant in *Mincey* were isolated from family, friends, and legal counsel. And Defendant ABDULMUTALLAB and the Defendant in *Mincey* were debilitated and helpless.

The only difference between *Mincey* and this case is that the Defendant in *Mincey* was read his *Miranda* rights. *Id.* However the Supreme Court still held that that the conduct of the law enforcement official was overbearing and coercive in nature, resulting in several involuntary statements by the defendant. *Id.* If the statements the Defendant in *Mincey* made were coercive and involuntary with the protection of *Miranda,* Defendant ABDULMUTALLAB's statements were certainly coercive -- he was not even afforded the protection of Miranda during the initial interrogation.

Defendant ABDULMUTALLAB's statements were the result of police coercion and were involuntary. As the government concedes, "[t]he use of an involuntary statement as evidence at a defendant's trial . . . is barred by the Fifth Amendment's Due Process clause." *See* Response at p. 4 (citing *Chavez v. Martinez*, 538 U.S. 760, 770 (2003).

## II.   BECAUSE THE FEDERAL AGENTS ASKED QUESTIONS THAT WERE NOT NECESSARY TO SECURE THE SAFETY OF THE PUBLIC, THE PUBLIC SAFETY EXCEPTION DOES NOT APPLY

According to the government, the agents who interviewed Defendant ABDULMUTALLAB were not required to provide *Miranda* warnings in view of *New York v. Quarles*, 467 U.S. 649 (1984), as the situation involved a "true public safety exigency."

In *Quarles*, two New York police officers were approached by a young woman who indicated that she was raped by a man who was carrying a gun. *Quarles*, 467 U.S. at 651-52. The officers went to the supermarket that the woman said the man entered and spotted an

individual who met the description given by the woman. *Id.* at 652. One of the officers frisked the individual and discovered that he was wearing a shoulder holster which was empty. Without reading the individual his *Miranda* rights, the officer asked him where the gun was, and he responded "the gun is over there." *Id.*

The United States Supreme Court held that there is a "public safety" exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence. *Id.* at 655. However, the "public safety" exception only applies to questions necessary to secure the safety of police officers or the safety of the public. *See id.* at 658-59. Because the officer in *Quarles* only asked the defendant a question that was necessary to secure the safety of the public before advising him of his *Miranda* rights, the Supreme Court held the defendant's statement was admissible. *Id.* at 659.

Here, the federal agents clearly asked Defendant ABDULMUTALLAB questions that were not necessary to secure the safety of the public, and were not "urgent" to the intelligence community. The agents asked Defendant ABDULMUTALLAB: (1) where he lived before traveling to Yemen; (2) what inspired him to commit jihad against the United States; (3) why he decided to join the jihad against the United States; (4) when he traveled to Yemen to pursue Al Qaida; (5) who encouraged or assisted him in locating members of Al Qaida; (6) how long he was enrolled as a student at the Sanaa Institute of Arabic Studies; (7) what he did as a student at the Sanaa Institute of Arabic Studies; (8) why he chose a particular mosque to attend; (9) what he did at that mosque; (10) who he associated with at the mosque; (11) who he lived with in Yemen; (12) where the house was located in Yemen; (13) what the individual he lived with did for a living; (14) who interacted with him in Yemen; (15) what him and his associates discussed while in Yemen; (16) about other potential plans to commit jihad, which were not executed; (17) who

suggested he detonate an explosive device on a plane; (18) when the plan to detonate an explosive device was suggested; (19) how the explosive device operated; (20) who trained him on how to operate the device; (21) where the device was manufactured; (22) when he actually received the device; (23) when the device was supposed to be deployed; (24) why he picked December 25, 2009; (25) where he traveled with the device; (26) whether he was directed to sit in a particular location of the plane; (27) what happened when he attempted to activate the device; and (28) whether he had been to the United States previously. *See* FBI 302 dated 12/26/2009.

These questions were not focused on additional threats to the United States, as the government claims. If the agents were truly concerned about securing the safety of the public, the only questions they needed to ask were whether he was acting alone, and whether additional attacks were planned on the United States. Instead, the agents conducted a full blown interview of Defendant ABDULMUTALLAB without the constitutional protections of *Miranda*. The "public safety" exception does not apply to the interview that was conducted on December 25, 2009 at the University of Michigan hospital, and Defendant ABDULMUTALLAB's statements must be suppressed.

## CONCLUSION

Defendant ABDULMUTALLAB respectfully requests that this Court grant Defendant's Motion to Suppress the Statements Made at the University of Michigan Hospital.

Respectfully Submitted,

s/Anthony T. Chambers
Anthony T. Chambers (P38177)
535 Griswold, Suite 1330
Detroit, Michigan 48226
(313) 964-5557
(313) 964-4801 Fax
achamberslaw@gmail.com

Dated: September 1, 2011

8

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,
          Plaintiff,

                                        CRIMINAL NO.  2:10-CR-20005
                                        HONORABLE NANCY G. EDMUNDS

          v.

D-1, UMAR FAROUK ABDULMUTALLAB,
          Defendant.

_____

## DEFENDANT'S ABDULMUTALLAB'S ACKNOWLEDGMENT AND ACCEPTANCE OF THE REPLY TO THE GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS MADE AT THE UNIVERSITY OF MICHIGAN HOSPITAL

_____

Umar Farouk Abdulmutallab
Register #44170-039
Milan Correctional Facility

Date: August 31, 2011