UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                  Plaintiff,          Hon. Nancy G. Edmunds
                                   Case No. 10-CR-20005
    v.

D-1 UMAR FAROUK ABDULMUTALLAB,

                  Defendant.
_____/


MOTION HEARING AND SENTENCING
before the Honorable Nancy G. Edmunds
Detroit, Michigan

FEBRUARY 16, 2012


APPEARANCES:

For the Government:  Mr. Jonathan Tukel, Esq.
                    Ms. Cathleen M. Corken, Esq.
                    Mr. Michael C. Martin, Esq.
                    United States Attorney's Office
                    211 W. Fort Street, Suite 2001
                    Detroit, MI 48226

For the Defendant:  Mr. Umar Farouk Abdulmutallab, In Pro Per

Standby Counsel:    Mr. Anthony T. Chambers, Esq.
                    ANTHONY T. CHAMBERS LAW OFFICE
                    535 Griswold, Suite 1330
                    Detroit, MI 48226

-   -   -


To obtain a copy of this official transcript, contact:
Suzanne Jacques, Official Federal Court Reporter
email: jacques@transcriptorders.com

# I   N   D   E   X

| Proceeding | Page |
|---|---|

MOTION TO PERMIT DEMONSTRATIVE EXPLOSIVE EVIDENCE
    Argument by Mr. Martin     4
    Response by Mr. Chambers     6

MOTION TO HOLD MANDATORY LIFE STATUTE UNCONSTITUTIONAL
    Argument by Mr. Chambers     9
    Response by Mr. Tukel     9
    Rebuttal by Mr. Chambers     10

MOTION TO STRIKE REPORT OF SIMON PERRY
    Argument by Mr. Chambers     13
    Response by Mr. Tukel     13
    Rebuttal by Mr. Chambers     15
    Further Response by Mr. Tukel     19

SENTENCING HEARING
    Victim Impact Statements     21
    Elocution     39
    Sentence by the Court     47

CERTIFICATE OF COURT REPORTER     58

2/16/2012 Sentencing Hearing

1          Detroit, Michigan

2          Thursday, February 16, 2012

3          1:35 p.m.

4          -   -   -

5          THE CLERK:  Court calls the case of United States

6    versus Umar Farouk Abdulmutallab, case number 10-20005.

7          State your appearances for the record please.

8          MR. TUKEL:  May it please the Court, Jonathan

9    Tukel, Cathleen Corken and Michael Martin, assistant U.S.

10   attorneys on behalf of the United States.

11         MR. CHAMBERS:  Good afternoon.  Anthony Chambers,

12   standby counsel, along with Mr. Abdulmutallab who is seated to

13   my left.

14         THE COURT:  Good afternoon.  This is the adjourned

15   date and time for sentencing in this matter.

16         Before we reach the actual analysis of the

17   sentence, the guidelines, et cetera, we have a few motions to

18   dispose of.  I have three, actually, that I'm aware of.

19         The first is the government's motion to submit a

20   video as part of their sentencing elocution.  The second is

21   defendant's motion to hold the statute at issue in this case,

22   one of the statutes, unconstitutional, on the basis of it being

23   cruel and unusual punishment and the absence of a Commerce

24   Clause connection, and the third is defendant's motion to

25   strike the report of Simon Perry from the sentencing

USA -v- Abdulmutallab    Case No. 10-CR-20005

1    submission.

2              So, Mr. Tukel, why don't you go first.

3              MR. TUKEL:  Your Honor, if you would like to hear

4    the motion about the video first, Mr. Martin will speak to

5    that.

6              THE COURT:  Mr. Martin.

7              MR. MARTIN:  Thank you, Your Honor.  Good

8    afternoon.

9              Your Honor, the government's motion seeks to allow

10   the government to play at sentencing a 52-second video clip of,

11   that was created by the FBI showing a demonstration by the FBI

12   of an explosion of 200 grams of PETN, which is a high

13   explosive.  This is the same video that was the subject of the

14   government's motion to admit before trial which the Court

15   granted and was intended to be an exhibit at trial, and the

16   video essentially is an explosion of 200 grams of PETN on a

17   sheet of aluminum that is suspended by two wooden sawhorses.

18             And as the Court may recall, the main charge of the

19   defendant's explosive device was a, essentially a cylinder of

20   PETN.  It was a plastic bag that measured about six inches long

21   and was about two inches in diameter.  I have a photo of that

22   I'd ask Ms. Secord to display on the screen.  This is the

23   actual main charge that was recovered from the aircraft.  You

24   can see the length there as well, and you can also see from

25   this photo that, at least a portion of the main charge was, as

1    it was found on the plane, damaged, and broken open and PETN is

2    visible, and PETN was recovered from the floor and some of the

3    clothing and other items in the aircraft.

4         So we know that the total amount of PETN that was

5    in this cylinder was not the total amount of PETN that the

6    defendant had prior to igniting the device.

7         The total amount of PETN in this cylinder was

8    76 grams, and so the FBI made an attempt to estimate the total

9    amount of PETN that would have been in that cylinder before he

10   detonated that, and using the length and the diameter of that

11   cylinder, they recreated a cylinder of the same volume, filled

12   it with PETN and came out with two estimates.  One was 200

13   grams and the other was 300 grams, and the difference is

14   whether or not the PETN was packed tightly into the cylinder as

15   it actually was in the device, or was not packed tightly.  The

16   not packed tightly yielded a conservative estimate of 200 grams

17   which is why the video the government intends to display at

18   sentencing today contains 200 grams.

19        The relevance of this demonstration is with respect

20   primarily to the counts of conviction that are not mandatory

21   because Your Honor must apply the standard 3553(a) factors in

22   determining the sentence with respect to those counts, and

23   certainly the nature and circumstances of the offense is one of

24   the factors you must consider, and this is highly relevant to

25   that.  It's made even more relevant by the fact that the

1    defendant in his pretrial -- or sentencing motions has

2    essentially made the argument to Your Honor that this wasn't

3    that big of a deal because no one was hurt, no one was injured,

4    the government can't prove that anybody would be harmed in any

5    way, and so, therefore, he's deserving of a lenient sentence

6    with respect to those counts, and certainly this evidence would

7    go to rebut that.

8             THE COURT:  Thank you, Mr. Martin.

9             Mr. Abdulmutallab, do you wish to have Mr. Chambers

10   respond on your behalf?  Is that a yes?

11            THE DEFENDANT:  Yes.

12            MR. CHAMBERS:  Yes, Your Honor, it is our intention

13   by way of procedure that I will make any responses to any of

14   the legal issues.

15            THE COURT:  That's fine.

16                                       (1:40 p.m.)

17            MR. CHAMBERS:  As it relates to the government's

18   request, we suggest there are two problems with their approach.

19   The first problem is the conditions upon which they're

20   suggesting that this explosiveness or this demonstration which

21   they've done will provide the Court with some insight.

22            The explosion for which they're offering to the

23   Court is something in an area where there's nothing surrounding

24   it.  It doesn't give any impact or even show to the Court if it

25   explodes what the damage would have, could have possibly would

USA -v- Abdulmutallab    Case No. 10-CR-20005

2/16/2012 Sentencing Hearing

1   be to an airplane, to any passengers.  The conditions are not

2   similar to the situation in this particular case.

3             I'm also going to suggest to the Court, it's really

4   not relevant because as relates to the elements of the offense,

5   Mr. Abdulmutallab has already pled guilty to the elements of

6   all of the offenses.

7             With regard to the demonstration, at best it's

8   highly speculative.  The government says, well, we were able to

9   retrieve 76 grams.

10            We don't know how many grams were there, how they

11  were packed, we don't know whether or not they were compromised

12  due to any elements, due to the way that it was packaged and

13  the manner in which it was carried by anyone.  We don't know

14  what the situation and circumstances are.  To say that we

15  estimate or believe it could be 200 or 300 grams so we want to

16  choose the 200 grams is not consistent with the evidence,

17  leading to further speculation, and, once again, not a similar

18  situation and something that I suggest does not provide the

19  Court with any insight.

20            We would ask the Court not to admit it.  We

21  understand that, yes, it was an exhibit that could have been

22  used during trial.  If it was used during trial, we then would

23  have had the opportunity also obviously to cross examine the

24  person who did the demonstration, the FBI agent, and ask him

25  various questions.

1           I would also suggest to the Court if the government

2    wanted to offer a video, there are videos out there using

3    amounts of PETN which are actually put on a plane, and when it

4    was shown that those explosives during this demonstration by a

5    retired, I believe, FBI agent, was put onto a plane, no damage

6    was done to the exterior of the plane, and the damage on the

7    interior was limited at best.  So there are all kinds of

8    exhibits to be presented to say, yes, it could do this but, no,

9    it couldn't do that.  But in this case, in the manner in which

10   they're offering it, it's speculative at best, and we ask the

11   Court not to allow it.

12           THE COURT:  Thank you.

13           I'm going to grant the government's motion.  I

14   think some of the defendant's points are well taken.  I think

15   that it is somewhat speculative exactly how much of PETN was

16   originally carried on the plane.  The government's done its

17   best to try to estimate that and has estimated on the low end

18   based on the configuration of what was actually found on the

19   plane.

20           There has been an argument made with respect to the

21   seriousness of the offense that what was taken onto the plane

22   was not capable of inflicting the kind of damage that the

23   prosecution was alleging in this case, and I think it goes to

24   that.

25           There's enough relevance here that I'm going to

USA -v- Abdulmutallab    Case No. 10-CR-20005

2/16/2012 Sentencing Hearing

1    permit it to be shown, but not at the moment.

2         I'd like to go to the second motion, that is,

3    defendant's motion to hold the statute, the relevant statute

4    unconstitutional for the two reasons I just stated.

5                                              (1:45 p.m.)

6         MR. CHAMBERS:  We are going to rely on our

7    pleading, but I just want to say to the Court, we believe that

8    in light of the circumstances and in light of the typical

9    sentencing, of course, the Court considers the conduct as well

10   as the background of the defendant, and various other factors

11   under 3553.  We believe that the Court should have some

12   discretion.  Whether you exercise that discretion and to what

13   degree obviously is another issue, but it's our position that

14   to say that life imprisonment without the possibility of parole

15   and any other considerations is in fact, we suggest, cruel and

16   unusual punishment under the circumstances where there has been

17   no death regardless of the intent of the act, and where there

18   has been no serious bodily injury to anyone, at least nothing

19   life threatening, I would suggest, even as it relates to

20   Mr. Abdulmutallab.

21        We would ask the Court to consider our motion,

22   consider our brief and rule in our favor.

23        THE COURT:  Mr. Tukel.

24                                              (1:46 p.m.)

25        MR. TUKEL:  Your Honor, in response to that, I'll

                USA -v- Abdulmutallab    Case No. 10-CR-20005

2/16/2012 Sentencing Hearing

1  just briefly say that that is essentially the exact same

2  argument that was made to the Supreme Court in Harmelin versus

3  Michigan in which a mandatory life sentence without possibility

4  of parole was upheld against an Eighth Amendment challenge

5  based upon the harm that could be done by that, and the

6  analysis that the Sixth Circuit has given us in cases such as

7  Hill is that the Court is to look at the seriousness of the

8  offense and the intended harm and whether or not violence was a

9  part of the crime, and determine whether it is at least that

10 serious.

11         And given the nature of what defendant was trying

12 to do here, which is to commit mass murder, that is

13 significantly more serious than the possessory offense at issue

14 in Harmelin, and if the sentence in Harmelin was

15 constitutional, which the Supreme Court held it was, then the

16 mandatory sentences in this case are also constitutional.

17         THE COURT:  Thank you, Mr. Tukel.

18         MR. CHAMBERS:  Can I just briefly respond?

19         THE COURT:  Sure, go ahead.

20                                          (1:47 p.m.)

21         MR. CHAMBERS:  Without question, it was upheld, but

22 that was not the statute in this case which is in question.

23 This statute, as far as our research is concerned, has really

24 not been thoroughly challenged.  Certainly there have been some

25 challenges as being cruel and unusual with regard to drug

USA -v- Abdulmutallab    Case No. 10-CR-20005

2/16/2012 Sentencing Hearing

1    statutes, but we would suggest to the Court that this is a

2    particular situation with specialized facts, that's all.

3              THE COURT:   Thank you, Mr. Chambers, Mr. Tukel.

4              I'm going to deny this motion.  I think it's pretty

5    clear that the Supreme Court would not find the life

6    imprisonment without parole sentence that's mandatory on two

7    counts in this case to be cruel and unusual.

8              The Supreme Court has held that in nondeath penalty

9    cases, the narrow proportionality principle applies, and the

10   key issue is the gravity of the offense and the harshness of

11   the penalty.  The Supreme Court has said that only gross

12   disproportionality in extreme cases merit constitutional

13   inquiry, and the lead case that Mr. Tukel cited, Harmelin

14   versus Michigan, did uphold a life sentence without parole for

15   a first-time offender, in a cocaine possession conviction.

16             I understand that it's a different statute,

17   Mr. Chambers, but if anything, the statute at issue in this

18   case covers a far more potentially damaging offense than the

19   simple cocaine possession at issue in the Harmelin case.

20             The Sixth Circuit has directly addressed the issue

21   that no one was actually physically injured and rejected that

22   argument in the case of United States versus Smith back in

23   2007.  In that case, there was a pipe bomb left at a place of

24   business which was discovered before it detonated, and the

25   Court rejected the cruel and unusual punishment argument.

2/16/2012 Sentencing Hearing

1          Harmelin, which we've already talked about, was a

2    case involving a first-time offender, so that issue falls as

3    well.

4          You haven't separately argued or articulated this

5    afternoon the Commerce Clause issue, but under the cases that

6    involve the 924(c) charges, the courts have held, the Sixth

7    Circuit most recently has held in 2003 that the destructive

8    device prong of that statute is not properly analyzed as a

9    free-standing statute, that you must focus on whether the

10   underlying crime involves the Commerce Clause.

11         Here, the underlying charges to the 924(c) offenses

12   have, as elements, a requirement of an effect on interstate

13   commerce, and the Lopez case on which the defendant relies

14   specifically says that congress has the authority to keep the

15   channels of interstate commerce free from injurious uses and is

16   empowered to regulate and protect the instrumentalities of

17   interstate commerce.

18         Clearly, the underlying offense in this case and

19   the underlying charges affect interstate commerce.  We're

20   talking about an international airline flight, not only

21   interstate but intercontinental commerce, and I don't see any

22   Commerce Clause issue that would require me to strike these

23   statutes.

24         So motion denied.

25         Mr. Chambers, you have one more motion.  That is,

              USA -v- Abdulmutallab     Case No. 10-CR-20005

2/16/2012 Sentencing Hearing

1    to strike the report of Simon Perry.

2                                                              (1:51 p.m.)

3            MR. CHAMBERS:  That is correct.  It is actually a

4    dual motion; one to move to strike, and another requesting

5    certain discovery materials if, in fact, the Court is going to

6    consider it.

7            We believe as it relates to Dr. Perry's memorandum

8    or the exhibit which is attached, Dr. Perry talks about

9    interviewing 40 individuals, or approximately 40 individuals.

10   We have not received a CV for Dr. Perry.  We would also like to

11   have copies of the actual studies of the 40 individuals.  We'd

12   like to see the interviews.  We'd like to be able to approach

13   and address it and confront it.  We believe that the

14   speculation involved in Dr. Perry's analysis as it relates to

15   Mr. Abdulmutallab, who he has never interviewed, nor has he

16   ever interviewed or met with any of his family members, anyone

17   in his community or any -- gotten any evidence relative to

18   Mr. Abdulmutallab to make it specific as to him so that he can

19   make an accurate determination.  We believe that if the Court

20   is going to consider any of the information from Dr. Perry, the

21   list of matters enumerated in our request, and we'd also ask

22   for an adjournment of the sentencing.

23           THE COURT:  Thank you.

24           Mr. Tukel.

25           MR. TUKEL:  Your Honor, as to the matter of the CV,

                USA -v- Abdulmutallab    Case No. 10-CR-20005

1    that was provided in discovery prior to the trial commencing.

2                 There's a number of matters, I mean, the rules of

3    evidence obviously don't apply to this proceeding.  The

4    defendant has said the confrontation clause.  The Sixth Circuit

5    has held on numerous occasions that the confrontation clause

6    doesn't apply at sentencing, and by statute, 18 U.S.C.

7    Section 3661 says that there shall be no limitation placed on

8    the information concerning the background, character and

9    conduct of a person convicted of an offense which a court of

10   the United States may receive and consider for the purposes of

11   imposing an appropriate sentence.

12                So it's our contention that this report from

13   Dr. Perry, with whatever weight the Court wish to place on it,

14   is particularly relevant in light of the fact that the

15   defendant now claims in his sentencing memorandum that there

16   is, quote, a likely possibility of the defendant reforming.

17   The report goes directly to that point.

18                And I think the defendant also misreads what

19   Dr. Perry is saying in his report.  Dr. Perry relied to a large

20   extent on the defendant's own words and the defendant's own

21   statements as to what his future intentions are, and he opined

22   on that in light of the research that he's done.  And one of

23   the things the defendant said, he said to this Court at the

24   time of his plea, is that he is under a religious obligation to

25   wage jihad and that waging it against the United States is

2/16/2012 Sentencing Hearing

1    highly encouraged.

2           So when we say in our sentencing memorandum, which

3    is what the defendant is objecting to, that the defendant poses

4    a continuing and ongoing threat, yes, we are to some extent

5    relying on Dr. Perry and his report, but we are also taking at

6    face value, as to Dr. Perry, the defendant's statements to the

7    Court.  So in light of those authorities, I think it is

8    properly part of the government's memorandum.

9                                              (1:54 p.m.)

10          MR. CHAMBERS:  While I agree that the rules of

11   evidence are not applicable, the due process requirements, I

12   think, still apply.  I'm going to also suggest to the Court we

13   have a Presentence Investigation Report in this case which has

14   been prepared.  The government says that he is relying upon

15   statements.  I want to suggest to the Court, he may also, and I

16   can't say for certain because I wasn't present when he was

17   given any information, may be relying upon statements made by

18   the defendant during negotiation purposes, and we're going to

19   have to address that issue when we get to the presentence

20   report.  And if so, then he perhaps has also included

21   statements which he's prohibited from having, and then, our

22   position, providing to the Court.  We would ask the Court not

23   to allow it.

24          We did also ask for the funds for which Dr. Perry's

25   been paid to make such an assessment and other matters which

                USA -v- Abdulmutallab    Case No. 10-CR-20005

2/16/2012 Sentencing Hearing

1   could affect his credibility or lack thereof.

2              THE COURT:  Thank you.

3              I'm actually going to grant this motion.  I think

4   it probably is admissible under the rules of evidence.  I mean,

5   rules of evidence don't apply in sentencing hearings, but I

6   think it's cumulative.  I think Dr. Perry relied extensively on

7   statements made by Mr. Abdulmutallab.  I believe that the Court

8   is perfectly capable of reading, and I heard those statements

9   at the time they were given, and I'm able to evaluate them on

10  my own without the assistance of that report.

11             So I have some concern about including it for the

12  reasons articulated by the defendant.  I don't think it's

13  necessary, and I'm going to grant the motion to strike it.

14             I think that's all the motions.  There were a

15  couple of objections filed to the Presentence Investigation

16  Report, one of which Mr. Chambers just alluded to, and

17  Mr. Chambers, perhaps you'd like to address that objection

18  first.

19             MR. CHAMBERS:  Yes.  And I will tell you, the

20  second objection, I believe, is moot.  I believe we resolved

21  that with the probation department.

22             THE COURT:  All right.

23             MR. CHAMBERS:  So there's really only one

24  objection.  Our objection is to the offense conduct that is

25  included in the presentence report.

2/16/2012 Sentencing Hearing

1                At a time prior to the trial beginning, shortly

2       after this incident occurred, Mr. Abdulmutallab, with his then

3       counsel from the Federal Defender's Office, engaged in plea

4       negotiations with the government.  During those plea

5       negotiations, there were discussions with regard to what took

6       place, other potential individuals, his role and this conduct,

7       and various other things.

8                There was, my understanding -- and I was not

9       present -- a Kastigar understanding during the course of these

10      discussions and during --

11               THE COURT:  I don't think -- correct me if I'm

12      wrong, but I do not believe that a proffer agreement was ever

13      signed by the defendant.

14               MR. CHAMBERS:  No, I'm not suggesting that it was

15      signed, but what is important is, although it wasn't signed by

16      the defendant, he was acting upon the representations of the

17      government, the prosecuting attorney's office, who did in fact,

18      I understand, sign it and did in fact agree to operate under

19      those provisions.

20               But regardless, I think, of whether or not Kastigar

21      is applicable in this case, Rule 11, I believe and would

22      suggest to the Court prevents the inclusion of these

23      statements, and the reason that I say that is because Rule 11,

24      if we look to 11(f), it talks about the admissibility or

25      inadmissibility of plea discussions and related statements, and

2/16/2012 Sentencing Hearing

 1    under Section F it talks about, "The admissibility or

 2    inadmissibility of a plea, a plea discussion, or any related

 3    statement is governed by Rule 410 of the Federal Rules of

 4    Evidence."

 5              When we go over to Rule 410 of the Federal Rules of

 6    Evidence and we look at Subsection 4, it talks about,

 7    "Prohibiting the use of any statement made in the course of

 8    plea discussions with an attorney for the prosecuting authority

 9    which did not result in a plea of guilty or which the plea of

10    guilty was later withdrawn."

11              THE COURT:  That's not in the context of the

12    sentencing hearing; that's for trial.

13              MR. CHAMBERS:  But if you look at the wording and

14    the language of that section, it doesn't say trial, it talks

15    about hearings, proceedings.  It doesn't except out a

16    sentencing hearing.  And I know hearings typically you can have

17    hearsay and everything else.  I understand that, but it does

18    not specifically say trial, it says "any civil or criminal

19    proceeding."

20              And I'm suggesting that this clearly is a criminal

21    proceeding, and it's our position that those statements were

22    made relying upon the statements that he believed that they

23    would not utilize them, and were being done for purposes of

24    trying to negotiate a plea, which obviously did not occur in

25    this case.

                USA -v- Abdulmutallab    Case No. 10-CR-20005

1              And typically, I understand the rules of evidence

2    do not apply.  However, I think that the plain reading of Rule

3    11 and 410 makes it applicable in this situation.

4              THE COURT:  All right.  Thank you.

5              MR. TUKEL:  Your Honor, the Court is exactly right,

6    Rule 1101(d)(3) says the rules of evidence are not applicable

7    at sentencing, so whatever is incorporated, whatever Rule 410

8    says doesn't matter.  It doesn't apply to these proceedings.

9              As far as any agreement, there was an agreement

10   that was offered to the defendant, the defendant rejected it,

11   the defendant did not sign it, he said he wished to go ahead

12   and proceed without it.  The government never signed it, there

13   was never a meeting of the minds.  That agreement never went

14   into force.  Those statements are admissible for purpose of

15   sentencing.

16                                             (1:59 p.m.)

17             THE COURT:  That's my understanding as well.  In

18   addition, there's a statute that's directly on point, 18 U.S.C.

19   Section 3661 states, "No limitation shall be placed on the

20   information concerning the background, character and conduct of

21   a person convicted of an offense which a court of the United

22   States will receive and consider for the purposes of imposing

23   an appropriate sentence."

24             I think this is really an objection that goes to

25   the offense conduct section of the presentence report.  In any

                USA -v- Abdulmutallab     Case No. 10-CR-20005

2/16/2012 Sentencing Hearing

1    event, it's more narrative than anything else.  It does not

2    really go to any guideline calculation, but I believe that it's

3    clearly appropriate under the statute and that the rules of

4    evidence, including Rule 410, would not apply.

5            So that takes care of the defendant's objections to

6    the Presentence Investigation Report.

7            Are there any other additions, corrections or

8    objections, Mr. Chambers and Mr. Abdulmutallab?

9            MR. CHAMBERS:  The only other statement that

10   Mr. Abdulmutallab would make which is in our objections is that

11   the offense conduct section is false and misleading.

12           THE COURT:  All right.  Thank you.

13           For the government, Mr. Tukel?

14           MR. TUKEL:  We have nothing further, Your Honor.

15           THE COURT:  All right.  I'd like to hear the victim

16   statements next, and then after the victim statements and some

17   comments concerning the requests for restitution that have been

18   received by the Court, I'll let the government play its video,

19   and then we'll go to elocution.

20           So there are, I believe, five people who have asked

21   to speak.  They have been previously informed that the

22   limitation on their time is five minutes each, and the first of

23   those is Mr. Lamare Mason.

24           Mr. Mason.

25                                          (2:02 p.m.)

USA –v– Abdulmutallab    Case No. 10-CR-20005

2/16/2012 Sentencing Hearing

1          MR. MASON:  Good afternoon, Judge and jury -- or

2   everyone.  My name is Lamare Mason.  I'm from Cleveland, Ohio,

3   and I am a Delta flight attendant based in Detroit, Michigan.

4   I was on -- I was an active crew member working Flight 253 from

5   Amsterdam, Netherlands to Detroit, Michigan.

6          Since that day, my life has changed.  I had a dream

7   job of traveling the world and meeting all types of people.

8   This man stole and robbed from me the pleasure.  It's

9   punishment going to work now, it's not a joy.  I never thought

10  that my life would change, to wake up in night sweats or

11  terrors or thinking someone's going to blow up the plane or try

12  to end my life or everyone else on an Airbus 330 aircraft.

13          It took a lot of courage for me to come today

14  because every day I'm on an airplane, and every day I hope that

15  the Court and everyone understands that it's my responsibility

16  if -- to ensure the safety and security of each passenger that

17  I took an oath in my FAA license to keep secure.

18          I just hope that the Court can understand that his

19  intentions were to end our lives in the aircraft and on the

20  plane, and twice a week it started out I was seeing my

21  therapist and now I'm down to twice a month, but it will never

22  be the same for me, so thank you.

23          THE COURT:  Thank you, Mr. Mason.

24                                          (2:03 p.m.)

25          THE COURT:  We have also Shama Chopra.

                USA -v- Abdulmutallab    Case No. 10-CR-20005

2/16/2012 Sentencing Hearing

1          MS. CHOPRA:  Good afternoon, Your Honor.

2          THE COURT:  Good afternoon.

3          MS. CHOPRA:  Mr. Abdulmutallab carried more PETN

4    than Richard Reid.  He was trained by Anwar Awlaki, the

5    terrorist who trained the likes of Major Nidal Hassan.  The

6    terrorist Osama Bin laden bragged about Abdulmutallab.

7          These terrorists did not miss the Twin Towers and

8    the Pentagon, but by the grace of God they missed this time,

9    and I'm alive to tell my story to the world.  Today, I am

10   standing before the world to say goodness won over evil.

11         I was sitting in Row 4A in first class.  When they

12   brought him to the front I could smell his burning flesh in

13   addition to all the smoke.  It was the most horrible moment in

14   my life, a moment which gave me nightmares to this day.  In the

15   beginning, I would sit in a chair and just do nothing.  I did

16   not feel like doing anything.  My whole life has been

17   overturned by the action of Abdulmutallab.

18         Then, my husband, Raman, and my twin sons,

19   Christian and Sylvan, stood by me.  My husband kept on telling

20   me that you cannot let these terrorists take control of your

21   life.  He encouraged me to give interviews and tell the world

22   that these terrorists should never be able to run our lives.

23         Exactly one month later, Your Honor, on 25th

24   January 2010, I took the same flight again from Amsterdam to

25   Detroit.  I could have gone directly from Amsterdam directly to

                USA -v- Abdulmutallab    Case No. 10-CR-20005

1    Montreal but I decided I'm going to take the same flight again,

2    and on 25th January 2010, I took that same flight again.

3            I took that flight again to tell the world that we

4    should not be afraid from these acts of terror, and to overcome

5    my fear of flying.

6            Instead of sitting there and crying, I found my

7    inner strength and it did wonders for me.

8            In April 2011, I was asked by the right honorable

9    prime minister of Canada, Mr. Harper, to run as a Conservative

10   Party candidate against the Honorable Justin Trudeau, the son

11   of the late Prime Minister Pierre Trudeau, and I did.

12           It was tough to -- it was tough to fight against a

13   candidate like him.  Montreal's airport is named after his

14   father.

15           Then one day in May 2010, Abdulmutallab's parents

16   called me from Nigeria.

17           Farouk, look at me.  I'm a mother of two boys who

18   are a bit older than you.  Your mother, Aisha, and father,

19   Dr. Mutallab, called me in May 2010 to apologize.  It broke my

20   heart.  They told me you were misled, and to this day, I

21   believe that you were misled.

22           Dr. Mutallab and Aisha did their best but this is

23   not a perfect world.  My husband, Raman, and your father have

24   talked many times, and every time, Raman had to tell your

25   father that it was not his fault.

2/16/2012 Sentencing Hearing

1          You have a chance to redeem yourself.  If you write

2     to me and truly tell me how we can prevent other young men and

3     women to be misled, I promise you that each one of your letters

4     will be published in full.

5          As a mother, I will work with you to make a better

6     world.  As a mother, I feel for you.  But I will not give you

7     or your terrorist friends an opportunity to break me down.  My

8     tears are not for people like you.  My tears are for those men

9     and women who have laid down their lives or are wounded while

10    fighting for freedom.

11         Look at that flag.  It is the flag of the United

12    States of America.  Under this flag, young and old, men and

13    women, have given their lives for freedom without thinking

14    twice.  Whenever terrorists have attacked the United States of

15    America, the world stands with them as one.

16         People who serve under this flag are never

17    forgotten, and people like you are forgotten very easily.

18    Under this flag, justice will be served.

19         Your friends could run but they could not hide from

20    the long arm of the law.  Today it is your turn, and justice

21    will be served.

22         I have served charities in India, Canada and United

23    States of America free of cost for over 30 years.  I am the

24    sole founder of the Hindu Temple in Montreal.  I sing free of

25    cost and raise funds for charities.

1              Your actions make me bolder and bigger.  Look at

2    me.  I am not afraid.

3              You tried to interfere with the work of God.  You

4    had no right to take my life, and therefore you failed.  Christ

5    has given me this life, and only he can take it back from me.

6              Here is a rosary for you.  Allow me to -- I'll give

7    him the rosary.  Take the name of Allah and look within

8    yourself.

9              If at a future date I am convinced that you are a

10   changed man, then one day I will be the first person to ask the

11   president of the United States of America to grant you a

12   pardon.

13             I truly believe people do change.

14             Your Honor, the terrorists have lost once again,

15   and we have won once again.  In the end, we always do.

16             I take this opportunity to thank all the lawyers

17   involved in the case from both sides.  You make us proud, and

18   for all the hard work you have done, I say thank you.

19             I forgive you Farouk.  Good luck, Farouk.

20             Thank you, thank you, Your Honor.

21             Your Honor, from me, I just want to give him the

22   rosary.

23             THE COURT:  You can hand it to Mr. Chambers if you

24   wish.

25             Mr. Theophilus Maranga.

                 USA -v- Abdulmutallab    Case No. 10-CR-20005

2/16/2012 Sentencing Hearing

```
 1                                          (2:10 p.m.)

 2                  MR. MARANGA:  Good afternoon, Your Honor.

 3                  THE COURT:  Good afternoon.

 4                  MR. MARANGA:  Theophilus Hussein Maranga.

 5            I am a native and citizen of Ghana, but I've been a

 6    permanent resident of the United States for the past 26 years,

 7    and I've been practicing law in New York.

 8            In 2008, I went home to stand as a member of

 9    parliament in my country.  I lost the election by 34 votes so I

10    decided to come back.  I spoke to a vice president and I told

11    him I'm going back to the U.S. to continue my law practice.

12            I bought my ticket in the same office that

13    Abdulmutallab bought his ticket.  My wife had come to the

14    airplane to meet me, and the children, because they don't see

15    me for a long time.  But by the grace of God, I'm still

16    standing here, and I believe that is the grace of God.

17            But what bothered me for a long time, because I was

18    also born into a Muslim family.  I'm no longer Muslim but I

19    still have family who are Muslims, and I respect them very

20    much.  My father has two -- my father and mother have two --

21    four children.  Two of us are Muslims now, and two of us are

22    Christians, and I don't believe in killing anybody in the name

23    of God.  God is a peace loving God, so I don't understand why

24    somebody would kill in the name of God, to then stand up and

25    kill almost 300 people.  That is very sad.
```

 1              I feel very, very, very, very sad for

 2    Mr. Abdulmutallab.

 3              And I spoke to my brothers and sisters, and they

 4    were shocked that somebody would take such an action.

 5              But what I want to say to Abdulmutallab is simple,

 6    that I believe that he has a zeal for God, but that zeal is

 7    misplaced and misguided, and therefore he should seek the true

 8    God.

 9              Now I cannot even fly on a plane.  Yesterday before

10    I left New York, I had to take some vodka because otherwise I

11    cannot, I'm scared to fly.  I lost my tooth, I still have it.

12    And I was very sad for this day, that somebody would decide to

13    kill somebody or kill almost 300 people in the name of God.

14    What kind of God is that?  God is peace loving, and God

15    wouldn't let anybody take anybody's life.

16              I'm so sorry for Abdulmutallab, and I pray for him

17    every day, my family prays for him that one day he will see the

18    true God, because I have brothers and sisters who are Muslims,

19    and they are fantastic.  They wouldn't do, they wouldn't even

20    kill an ant, my father was a pacifist, my father wouldn't kill

21    even an ant, so we don't know why he should do that.

22              I'm scared to fly, and my family was even scared

23    for me coming here, but I believe God was in control and God

24    saved our lives.

25              So I wish Abdulmutallab very well, but I pray that

                  USA -v- Abdulmutallab    Case No. 10-CR-20005

1    he will seek God zealously.  If I had opportunity to speak to

2    him in my native -- I'm not from my Nigeria but I speak Hausa

3    very well, his native language.  I wish they allow me to speak

4    to him in Hausa.

5            My family still loves him and we pray for him.  God

6    bless America.

7            THE COURT:  Thank you, Mr. Maranga.

8                                              (2:14 p.m.)

9            MR. HASKELL:  Good afternoon, Judge.

10           THE COURT:  Good afternoon.

11           MR. HASKELL:  Before I get started, I wanted to say

12   thank you to Lamare Mason.  Would you stand, Lamare?

13           It's hard for me to say this, but Lamare put out

14   the fire on our plane and saved all of our lives, and for that

15   I would just like to say thank you and you have my applause,

16   Lamare.

17           In regards to my statement, I would like to thank

18   the Court for giving me these five minutes and note that my

19   references to the government in the statement do not refer to

20   the Court or the prosecution but merely the federal government

21   itself.

22           I think it's pretty unfortunate that I have to say

23   some of the things that I do today, but I'm going to say them

24   anyway.

25           On Christmas day 2009, my wife Lori and I were

                USA -v- Abdulmutallab    Case No. 10-CR-20005

1    returning from an African safari and we had a connecting flight

2    through Amsterdam.

3              As we waited for our flight, we sat on the floor

4    next to the boarding gate, and what I witnessed while sitting

5    there and subsequent events have changed my life forever.

6    While I sat there, I witnessed Umar, he was wearing jeans and a

7    white T shirt, just like he is today.  He was being escorted

8    through security by a man in a tan suit who spoke perfect

9    English, American English without an accent.  He aided Umar in

10   boarding our flight without a passport.  The airline gate

11   worker initially refused Umar boarding until the man in the tan

12   suit intervened.

13             At the time, the event meant nothing to me at all,

14   I didn't know who Umar was, and I didn't think about it at all,

15   but little did I know that Umar would try and kill me just a

16   few hours later as our flight approached Detroit.

17             The final ten minutes of our flight after the

18   attack were the worst minutes of my life, without question.

19   During those ten minutes, I sat paralyzed in fear.

20   Unfortunately, what happened next has had an even greater

21   impact on my life and has saddened me even further.

22             When we landed, I was shocked that our plane taxied

23   to the gate.  I was further shocked that we were forced to sit

24   on the plane for 20 minutes, supposedly with PETN all around

25   us, and supposedly with parts of a bomb all over the cabin.

1          The officers that boarded the plane did nothing to

2     ensure our safety and did not check for accomplices or other

3     explosive devices.  Several passengers trampled through parts

4     of the bomb and even walked through the supposed PETN as they

5     exited the plane.

6          We were taken into a terminal with our carry-on

7     bags unchecked.  There was no concern for our safety

8     whatsoever, even though Umar told officers as he exited the

9     plane that there was another bomb on the plane.

10         I wondered why nobody was concerned for our safety,

11    accomplices, or other bombs on the plane.  It worried me

12    greatly.  I immediately told the FBI my story on what I had

13    seen in Amsterdam to help catch the accomplice of Umar's.  It

14    soon became obvious that the FBI had no intention to deal with

15    what I said at all and wasn't interested.  For one month, the

16    government refused to admit the existence of the man in the tan

17    suit before changing course and admitting his existence, which

18    appeared in an ABC news article on January 22, 2010.  That was

19    the last time the government talked about this man.

20         The video that would prove the truth of my account

21    has never been released, and I don't know if this is proper or

22    not, but I would ask this Court to release it after the

23    sentencing here today to clear my good name.

24         I continue to be very emotionally upset that the

25    video has never been released.  The Dutch police meanwhile, in

1   this article that I have here today, if anyone would like to

2   see it, admitted that Umar boarded our flight without ever

3   showing his passport in Amsterdam, and because passport check

4   and security are in the same line, by admitting that he didn't

5   show his passport, Dutch police admitted that he also did not

6   go through security at all.

7            It upsets me greatly that the government refuses to

8   admit this fact.  I became further saddened from this case when

9   Patrick Kennedy of the State Department during congressional

10  hearings admitted that Umar was a known terrorist, was being

11  followed, and the U.S. allowed him to enter into the U.S.

12  intentionally so it could catch accomplices of Umar's.

13           I was once again shocked and saddened when Michael

14  Leiter of the National Counter-Terrorism Center admitted during

15  the same hearings that intentionally letting terrorists into

16  the U.S. was a frequent practice of the U.S. government.  I

17  cannot fully explain my sadness, disappointment and fear when I

18  realized that my own government allowed this attack to happen

19  intentionally.

20           During this time, I questioned if my government

21  actually put Umar on a plane intentionally with a live bomb.  I

22  had many, many sleepless nights over this issue.  My answer

23  came shortly thereafter in late 2010.  I noticed that the FBI

24  had admitted to giving out intentionally defective bombs to

25  numerous terrorists, including the Portland Christmas tree

2/16/2012 Sentencing Hearing

1    bomber and Wrigley Field bomber.

2              Further, I took note of the Free Press article

3    January 11, 2011, when standby attorney Chambers was quoted as

4    indicating the government's own experts in this case admitted

5    that the bomb was impossibly defective.  I wondered how that

6    could be.  Certainly, I thought al Qaeda wouldn't go through

7    all the trouble to plant such an attack only to provide Umar

8    with an impossibly defective bomb.

9              I attended nearly all of the pretrial hearings in

10   this matter, and at a hearing on January 28, 2011, I was

11   greatly disappointed by the prosecution's request to block

12   evidence by Mr. Chambers, and I quote:  "As it could then be

13   able to be obtained by third parties who could use it to sue

14   the government in a civil suit."  This was extremely troubling

15   to me because it was an admission of wrongdoing of some kind on

16   the part of the government.

17             It further upset me that the government was putting

18   its own interest in hiding the true events of this story ahead

19   of those of the passengers.

20             When I attended the jury selection hearings, I

21   question why versions of the same two questions kept coming up,

22   those being the following:  "Do you think whether -- you'll be

23   able to tell whether something is actually a bomb?"  And, "Do

24   you realize that sometimes the media doesn't always tell the

25   truth?"

1          I continued to be greatly saddened at this point as

2     I felt the truth continued to be hidden.  When Umar listed me

3     as his only witness, I was happy to testify, not on his behalf

4     but on behalf of the truth.  I never expected to testify as my

5     eyewitness account would have been too damaging to the myth

6     that the government and the media are trying to put forward.

7          A mere five days after I was announced as a

8     witness, there was an inexplicable guilty plea which

9     exasperated me as I would no longer be able to testify in this

10    matter.

11         In closing, I will just say that regardless of how

12    the media and government try to shape the public's perception

13    of this case, I am convinced beyond a shadow of a doubt that

14    Umar was given an intentionally defective bomb by a U.S.

15    government agent of some sort and placed on our flight without

16    ever showing a passport and without going through security at

17    Amsterdam, in order to stage a false terrorist attack to be

18    used to implement various government policies which it in fact

19    has done.

20         It really bothers me that the government will not

21    admit its role in this event, but I do not expect that it

22    would.  The effect this matter has had on my life has been

23    astounding, and due to this case, I will never, ever trust

24    anything the government says, ever.

25         In regards to sentencing, nothing I've said excuses

USA -v- Abdulmutallab    Case No. 10-CR-20005

1    the fact that Umar tried to kill me.  He has waived what I

2    believe would have been a very valid entrapment defense, and

3    like I said, I would have testified in this matter with an

4    entrapment defense.  Umar has not allowed me to do that.

5                I would just like to say one final thing to Umar,

6    you are not a great Muslim martyr.  You are merely a government

7    patsy.

8                Thank you for this time, Your Honor.  I ask the

9    Court to impose the mandatory sentence.

10               THE COURT:  Mrs. Haskell, do you have anything

11   different you wish to say other than what your husband has said

12   about the government conspiracy?

13                                                    (2:23 p.m.)

14               MRS. HASKELL:  I don't have anything to say about a

15   government conspiracy, Your Honor.

16               Thank you for this time, Your Honor.  You swore me

17   into this court five and-a-half years ago, and I never guessed

18   today I would be here to give any kind of victim impact

19   statement.

20               Christmas, I was sitting with my husband eight rows

21   behind where the commotion started.  First, we saw smoke, then

22   we heard yelling, and then I saw that the plane was on fire.

23   Flames were starting to spread up the wall, then above the

24   wall.  I looked at my husband, terrified.  I sat there in

25   shock.  I thought about my mom, my family, I thought about how

1  my husband was terrified of flying before this, and could not

2  believe that something like this was happening to us.

3          I thought my life was over.  I've never been that

4  scared before in my life, and I hope to never be that scared

5  again.  Nobody knew or understood what was going on, and then

6  it was over.  A flight attendant, who I had the pleasure of

7  meeting today and thanking for saving my life, put out the fire

8  and we quickly landed.

9          For weeks after the incident, I think I was in a

10  state of shock.  For months after the incident, I had

11  nightmares about fires on planes and dying.  Once in a while, I

12  still have nightmares about the incident, which tend to occur

13  after the hearings that I attend on this case.

14          After all of that, you would think I would be angry

15  at the defendant, and I was at first.  I'm not any longer.  My

16  outlook on life has always been that things happen for a reason

17  and I always try to find the positive in every situation.

18          I would ask that the Court sentence the defendant

19  to the mandatory sentence of life in prison without parole and

20  disregard Mr. Chambers' recent filing with the Court asking for

21  a more lenient sentence because nobody was actually harmed.

22  This is a joke.  We were all harmed, very much so.  I am

23  thankful I am still alive, but what the defendant did caused

24  lifetime harm to me and everybody else on the plane which I

25  think has been seen today with the statements that have been

1   given by all of us.

2          All of us on that plane have a special connection

3   that nobody else will ever understand unless they've been

4   through something similar.  We all continue to be affected by

5   this incident and will be for the rest of our lives, both

6   directly and indirectly.

7          And even though it was one of the worst things that

8   I've ever experienced, I have learned a lot from the

9   experience.  Being on that plane and part of a near-death

10  experience has taught me to be a more aware person and a better

11  attorney.  I have now made it one of my goals in life to

12  educate others, to question things more, become involved, don't

13  just assume things are being done correctly because someone, or

14  the government, tells you that.

15         I'm happy that this is the final hearing and closes

16  this chapter in my life.  I'd like to move on and never think

17  about this ever again.

18         I'd like to again thank the Court for allowing me

19  time to make my statement.

20                                      (2:27 p.m.)

21         THE COURT:  Thank you, Mrs. Haskell.

22         I think that concludes the victim statements.

23  There were no other requests for time to speak that I'm aware

24  of.  And before I move to the issue of restitution, I think

25  it's probably appropriate to have the government play the video

USA -v- Abdulmutallab    Case No. 10-CR-20005

1    that it wishes to play.

2              MS. CORKEN:  Your Honor, with the Court's

3    permission I'd like to play it during my statement.

4              THE COURT:  All right.  That's fine.

5              Then I will review the requests for restitution

6    that were filed in this case and give a preliminary ruling with

7    respect to those.

8              Final ruling I'll obviously save until I actually

9    pronounce sentence, but I had eight requests for restitution

10   which were documented in some way, and I have reviewed all of

11   those.  Some of them, about half of them, are for specific

12   expenses which were incurred for, for example, somebody had to

13   give up his jacket so that the FBI could test the chemical

14   residue that was on the jacket, and he's asking for the value

15   of the jacket.

16             Others had missed plane connections or that sort of

17   thing.  I have reviewed the requests, and make a tentative

18   award of actual expenses to Dior Adel, Jenny Adel, Robert

19   Digennaro, Michelle Dillemuth, Anne Fernandez, Geoffrey Howard,

20   Annmarie Kamper and Kris Lizaso, not to exceed $400 in any one

21   case.  Several of the requests were for substantially in excess

22   of $400, but I'm limiting the restitution amounts to actual

23   expenses documented, not to exceed $400 per person.

24             And in doing so, I'd just note that under the

25   sentencing, the restitution statute that is 18 U.S.C.

USA -v- Abdulmutallab    Case No. 10-CR-20005

1    Section 3663(b), the Court, in determining whether to order

2    restitution under this section, is directed to consider, first,

3    the amount of the loss sustained by each victim as a result of

4    the offense, and second, the financial resources of the

5    defendant, the financial needs and earning ability of the

6    defendant and the defendant's dependents and such other factors

7    as the Court deems appropriate.

8            I don't believe, given the nature of the sentence

9    to be imposed today, that this defendant has any ability to pay

10   restitution, certainly at the present time, and even if he's

11   permitted to participate in some sort of work program

12   eventually while he is in custody, it will be an extremely

13   limited amount that he's ever able to generate, so that is the

14   basis for my limitation on the requests.

15           I should also say for the record that every

16   passenger and staff person on the flight was notified by the --

17   Sandy Palazzolo of the United States Attorney's office that

18   they could, if they wished, submit a request for restitution

19   and that the deadline for submitting such requests is the end

20   of November of last year.  We did get a couple of later

21   requests, but everyone was informed that the deadline was

22   November 30th, and I believe that all of the ones that I

23   articulated were submitted before that time, and none other.  I

24   haven't rejected any, but I'm also not opening this up to

25   further requests for restitution given that everyone was

1    informed of the deadline.  Only these were submitted.

2              I'd like to move now to the portion of the

3    sentencing hearing that we call elocution where counsel and the

4    defendant himself are able to make statements, and I'll begin,

5    Mr. Chambers, by asking if you would like to make a statement

6    on behalf of Mr. Abdulmutallab.

7              MR. CHAMBERS:  I believe Mr. Abdulmutallab is going

8    to make a statement himself.

9              THE COURT:  All right.  I was clearly going to

10    invite him to do it himself.  Do you have an additional

11    statement, or no?

12              MR. CHAMBERS:  I do not.

13              THE COURT:  All right.  Mr. Abdulmutallab.

14                                        (2:31 p.m.)

15              THE DEFENDANT:  In the name of Allah, the most

16    merciful, the most gracious, all praise to Allah and peace and

17    blessings to be upon his messenger, Muhammad, the final and

18    last messenger to mankind.

19              As for what follows, in quick response to some of

20    the things that have been said, to Lamare Mason, I say my life

21    and the lives of Muslims has also changed due to the U.S.

22    attacks on Muslim civilians.  And to Miss Chopra, I say Shaykh

23    Osama Bin Laden and Shaykh Anwar Al-Awlaki are alive and shall

24    be victorious by God's grace, and Shaykh Osama Bin Laden and

25    Anwar Al-Awlaki are rightly guided and God knows best doers are

1    guided.

2           God said it is those who do not -- it is those --

3    God said those who do not rule by what he has revealed are the

4    oppressors, and whatever God decrees for a Muslim is not a

5    failure.

6           And then to Mr. Maranga, I say God is a merciful,

7    his mercy is borne in his anger and God is also severe in

8    punishment.  This is why there is heaven and hell even in

9    Christianity.  The mujahedeen are proud to kill in the name of

10   God, and that is exactly what God told us to do in the Koran.

11          And to Kurt Haskell, every Muslim testifies that

12   there is no God but Allah, and that Muhammad, peace be upon

13   him, is his final messenger, and I testify to that, and I am

14   not a U.S. government patty(sic).

15          The situation of the one who believes in Allah is

16   always good.  Whatever happens to him is good for him.  It is

17   always a win-win situation, and this is the situation only for

18   the believer in Allah.  This is what Muhammad, peace be upon

19   him, teaches us.

20          Today is a day of victory, and God is great, and

21   indeed God said you'll find the harshest people to those who

22   believe in Allah to be the jews, and indeed, Simon Perry, who

23   wanted to speak today fits that description very well.  There

24   are devils among spirits and men, and whoever wants to see one

25   can look at Simon Perry, along with his partners in crime, the

1    FBI agents and, of course, the U.S. Attorneys, Michael Martin,

2    Jonathan Tukel and Cathleen Corken.

3           They intentionally misquote and mispresent(sic)

4    facts with false statements in order to achieve their evil

5    goals.  The mujahedeen, by God's permission, shall continue

6    unharmed and unopposed by the adversaries until the jews are

7    driven out of Palestine and the righteous servants of Allah

8    inherit the world with former great Assyria that includes

9    Palestine as the capital of the Muslim world.

10           This, the messenger of God, Muhammad, peace be upon

11   him, promised us, and he speaks the truth.  And our final call

12   is all praise to Allah, peace be on those who follow guidance.

13           MR. CHAMBERS:  I would just indicate for the

14   record, I did not give an elocution because of

15   Mr. Abdulmutallab's wishes.

16           THE COURT:  Thank you, Mr. Chambers.  Thank you

17   Mr. Abdulmutallab.  Ms. Corken.

18                                      (2:35 p.m.)

19           MS. CORKEN:  Yes, Your Honor, thank you.

20           Your Honor, as the Court's aware, the government is

21   asking that the Court impose the maximum sentence on the

22   nonmandatory counts, and that is a sentence that's called for

23   by the sentencing guidelines, and it is the sentence that is

24   fully justified by the seriousness of the defendant's conduct

25   in this case.

USA -v- Abdulmutallab    Case No. 10-CR-20005

2/16/2012 Sentencing Hearing

1              The defendant is someone who attempted to commit

2    mass murder.  On Christmas day of 2009, he boarded Flight 253

3    with a cold blooded, calculated plan to destroy Flight 253 and

4    to murder all 259 people aboard it.  He had hidden in his

5    underwear a device that was designed to cause massive damage to

6    accomplish that plan, and on the descendent to Detroit, he

7    depressed the syringe of that device, fully intending that

8    device to bring the plane down over U.S. soil, as he later told

9    law enforcement officers.

10             The video that we plan to play for you will show

11   you just what the defendant's explosive device was designed to

12   do and intended to do.  The first clip is in real time, Your

13   Honor.

14             (Videotape played.)

15             THE DEFENDANT:  Allahu Akbar.

16             MS. CORKEN:  This is slow motion, Your Honor.

17             THE DEFENDANT:  Allahu Akbar.

18             MS. CORKEN:  Your Honor, this is what defendant

19   referred to during the plea as a blessed weapon.  I'd like to

20   offer the Court for its inspection one of the shards from the

21   aluminum that the device was sitting on in the explosive

22   demonstration.

23             THE DEFENDANT:  Allahu Akbar.

24             THE COURT:  I'm sorry, Mr. Chambers, do you know

25   what it is that the defendant is saying?

                USA -v- Abdulmutallab    Case No. 10-CR-20005

1          MS. CORKEN:  God is great, Your Honor.

2          THE COURT:  Thank you.

3          MS. CORKEN:  Your Honor, I offer that shard from

4    the aluminum to illustrate to the Court the damage that could

5    have been caused by the device that the defendant was wearing.

6          The defendant claims in its recent filing with the

7    Court that because the device did not function fully and no

8    death or serious bodily injury occurred in this case that he

9    should be treated more leniently.

10          The defendant did everything possible that he could

11    to bring about the destruction of Flight 253 and the death of

12    its passengers.  His plan failed not because of something that

13    he did, not because of something that he failed to do.  His

14    plan failed because of a technical glitch in the operation of

15    the device, a glitch that the defendant was completely unaware

16    of.

17          It was sheer fortuity that numerous deaths were

18    averted in this case.  It wasn't the defendant's doing and he

19    shouldn't be given credit for that.  The defendant also argued

20    in his recent filing that there was not a single victim in this

21    case.  The passengers here and in interviews with us have

22    described the trauma, the panic and the terror that they

23    suffered on that plane when the fire erupted in the cabin.

24          Lamare Mason could tell you, I'm sure, or a pilot

25    certainly would, that fire in an airplane is about the most

2/16/2012 Sentencing Hearing

1    dangerous thing that you can have.  If it's not brought under

2    control, you're gone.  There are not fire engines that are

3    going to come to the rescue thousands of feet in the air.

4           The passengers have told us, many have, that they

5    thought they were going to die, that they thought that the

6    children that were with them were going to die, and many

7    passengers, as the Court knows, still suffer from the trauma of

8    the incident, as the victim impact statements certainly attest.

9           In addition to the trauma that passengers and crew

10   suffered, the defendant's conduct, of course, had a broader

11   impact.  It was intended to.  And the American public at large

12   was victimized by the defendant's conduct.  There were also, as

13   the Court knows, enormous costs associated with augmented

14   security measures that were put in place after the defendant's

15   attacks.  So there were certainly actual victims of the

16   defendant's conduct, there was certainly actual harm caused by

17   the defendant's conduct.

18          The defendant has also argued for a sentence below

19   the guideline range based on lack of criminal record.  His

20   conduct is so serious, so egregious that the maximum sentence

21   is warranted regardless of his lack of criminal record, and

22   that's certainly the view that is expressed through the

23   sentencing guidelines.  For terrorism offenses, defendants are

24   treated in the highest criminal history category, regardless of

25   their actual criminal history.

USA -v- Abdulmutallab    Case No. 10-CR-20005

1              In addition, the base offense level for the

2     defendant's offenses in this case is so high, it's at 43, that

3     his sentence would be life regardless of whether it's category

4     I or it's category VI.  So the sentencing guidelines reflect

5     what we would say is the sound view, that when it comes to

6     terrorism, it really doesn't matter if you've been around the

7     criminal block a previous time.

8              The defendant also in his recent filing asked for a

9     sentence below the guideline range, and leniency, claiming that

10    he can be rehabilitated.  I will just ask the Court to keep in

11    mind the defendant's statements here today, the defendant's

12    statements at the time of his plea.  It's been two years since

13    the offense, and I think it's clear from those statements that

14    there is very little prospect of rehabilitation in this case.

15    Rehabilitation requires an acknowledgment of wrongdoing, some

16    expression of remorse, some feeling of regret.  There has been

17    no expression of regret, remorse, an acknowledgment of

18    wrongdoing on the part of defendant.

19             As he stated today, he and those who think alike,

20    think similarly to the defendant are proud to kill in the name

21    of God.  So there certainly is no basis for a more lenient

22    sentence based on the defendant's potential rehabilitative --

23    potential for rehabilitation.  We would say that there is no

24    such potential.  Quite the opposite, in fact, Your Honor, given

25    the defendant's statements both in his plea and his statements

1   today.

2          The sentence needs to incapacitate him for as long

3   as possible so he no longer or never will have the opportunity

4   to harm anyone.  In addition, there is the goal of general

5   deterrence.  It may be unlikely that the Court could deter a

6   committed suicide bomber, but the Court could deter somebody

7   who is headed down that path.  Terrorists, including suicide

8   bombers, are not born that way.  Radicalization takes time and

9   it's a process.

10          The Court should send a message to those who have

11  started down that path or who are considering terroristic acts

12  down the road that if they do commit such an act, they will

13  feel the full weight of the law and they will receive the

14  maximum possible punishment.

15          Your Honor, the maximum sentence on all counts here

16  is also consistent with sentences in other cases.  We cited a

17  number of those cases in our sentencing memo.  I'm certainly

18  not going to recite them here.  I'd just remind the Court of

19  the Richard Reid case, which is the closest factually to this

20  case, where there were three nonmandatory life sentences, and

21  the defendant received the maximum on other discretionary

22  counts.

23          Same thing is true in the Shahzad case, the Times

24  Square bomber case, where the defendant there received

25  nonmandatory life sentences and the maximum sentences on other

2/16/2012 Sentencing Hearing

1    discretionary counts.  I'd note that he doesn't have a criminal

2    record, and in neither the Richard Reid case nor the Shahzad

3    case was there serious bodily injury or death.

4              A below-the-maximum sentence in this case, Your

5    Honor, sends the message that terrorism is excused, at least in

6    some measure, be it by virtue of a defendant's age, his lack of

7    criminal record, or because of a mechanical failure in an

8    explosive.

9              It's important for the Court's sentence to express

10   just the opposite message, that there is no justification, that

11   there is no rationale, that there is no excuse for blowing up a

12   plane and for trying to kill hundreds of innocent people.

13             We ask the Court to impose the maximum sentence on

14   each count as called for by the sentencing guidelines.  It

15   fairly punishes the defendant, it reflects the seriousness of

16   the offense, and then insures that he will never again have a

17   chance to harm Americans in the future.

18                                              (2:48 p.m.)

19             THE COURT:  Thank you, Ms. Corken.

20             Well, as a preliminary matter, I'd like to just

21   review the eight offenses to which the defendant has pled

22   guilty in this matter.

23             Count 1, conspiracy to commit an act of terrorism

24   transcending national boundaries; Count 2, possession of a

25   firearm or destructive device in furtherance of a crime of

violence; Count 3, attempted murder within the special aircraft

jurisdiction of the United States; Count 4, use and carrying of

a firearm or destructive device during and in relation to a

crime of violence; Count 5, willfully placing a destructive

device in, upon and in proximity to a civil aircraft which was

used and operated in interstate, overseas and foreign air

commerce which was likely to have endangered the safety of such

aircraft; Count 6, possession of a firearm or destructive

device in furtherance of a crime of violence; Count 7,

attempted use of a weapon of mass destruction, and Count 8,

willful attempt to destroy and wreck a civil aircraft.

On the statutes at issue in each count, defendant

faces up to 20 years of imprisonment on Counts 3, 5, and 8

which may run concurrent to each other, up to life imprisonment

on Count 7, also concurrent to the other three counts, that is,

Counts 3, 5 and 8, a mandatory consecutive sentence of 30 years

on Count 2, mandatory consecutive sentences on Counts 1, 4, and

6.  The sentence on Count 1 is up to life in prison, and Counts

4 and 6 are mandatory consecutive life in prison sentences.

With respect to the guidelines, in the present

case, the sentencing guidelines in addition to the statutes

also provide for life sentences.  As I just noted, Counts 4 and

6 carry statutorily mandated life sentences, consecutive life

sentences.  Counts 1, 3, 5, 7 and 8 all are subject to the

terrorism enhancement of the United States Sentencing

1    Guidelines Section 3A1.4 which adds 12 levels to each of the

2    base offenses and also places defendant in criminal history

3    category VI.  As a result, each of the nonmandatory counts has

4    an adjusted offense level above level 43, which is the highest

5    level contained in the guidelines.

6           An offense level of 43 calls for a life sentence at

7    any criminal history level.  The fact that the terrorism

8    enhancement places defendant in the most serious criminal

9    history category merely reinforces the fact that the Sentencing

10   Commission sought to ensure life sentences for individuals who

11   commit the types of offenses of which defendant was convicted.

12          Now, the guidelines that I just referred to are not

13   mandatory anymore, they're advisory, and the Court is directed

14   under the sentencing statute, 18 U.S.C. Section 3553(a) to

15   consider the following factors in imposing sentence.  Number

16   one, the nature and circumstances of the offense and the

17   history and characteristics of the defendant; number two, the

18   need for the sentence imposed to reflect the seriousness of the

19   offense, to promote respect for the law and to provide just

20   punishment for the offense, to afford adequate deterrence to

21   criminal conduct, to protect the public from further crimes of

22   the defendant, and to provide the defendant with needed

23   educational or vocational training, medical care or other

24   correctional treatment in the most effective manner.

25          The third factor is the kind of sentences

                 USA -v- Abdulmutallab    Case No. 10-CR-20005

2/16/2012 Sentencing Hearing

1    available, the fourth is the sentencing guidelines applicable

2    to the defense, and the fifth is the need to avoid unwarranted

3    sentencing disparities among defendants with similar records

4    who have been found guilty of similar conduct.

5            So, first, the nature and circumstances of the

6    offense and the history and characteristics of the defendant.

7    I think it needs to be emphasized, and we have certainly heard

8    some moving testimony this afternoon from several of the people

9    on board that plane that this was an act of terrorism that

10   cannot be quibbled with.

11           Terrorism has been defined a lot of ways but some

12   of the most salient definitions, it seems to me, is terrorism

13   is the premeditated, deliberate, systematic murder, mayhem and

14   threatening of the innocent to create fear and intimidation in

15   order to gain a political or tactical advantage, usually to

16   influence an audience.  We certainly have that in this case, as

17   we heard from those who were on board the plane, and our own

18   experience of the last 12 years since September 11 confirms

19   that definition for all of us.

20           The UN General Assembly Resolution of 1994 states

21   as follows with respect to terrorism:  "Criminal acts intended

22   or calculated to provoke a state of terror in the general

23   public, a group of persons or particular persons for political

24   purposes are in any circumstance unjustifiable, whatever the

25   considerations of a political, philosophical, ideological,

USA -v- Abdulmutallab    Case No. 10-CR-20005

2/16/2012 Sentencing Hearing

1    racial, ethnic, religious or any other nature that may be

2    invoked to justify them."

3           And finally, the United States definition of

4    terrorism under the federal criminal code is, "Activities that

5    involve violent or life-threatening acts that are a violation

6    of the criminal laws of the United States or any state and

7    appear to be intended to intimidate or coerce a civilian

8    population, to influence the policy of a government by

9    intimidation or coercion, or to affect the conduct of a

10   government by mass destruction, assassination or kidnapping,

11   and occur primarily within the territorial jurisdiction of the

12   United States."

13          Anyone who has sat through any of the proceedings

14   in this case knows that the direction that Mr. Abdulmutallab

15   was given was that he should wait to detonate his bomb until he

16   was over the United States, and by his own statements in the

17   past and certainly here today this act was undertaken to

18   achieve a political and religious objective.

19          So the nature and circumstances of the offense are

20   not in dispute.  Defendant attempted to blow up an airplane

21   with 289 people on board and he failed to accomplish this

22   objective only because of a technical problem with his bomb.

23   Defendant, by his own statements, was deeply committed to his

24   mission, seeking out and finding al Qaeda and Anwar Al-Awlaki,

25   volunteering for a martyrdom mission and then becoming involved

2/16/2012 Sentencing Hearing

1    in planning and training for a significant amount of time.

2           When he entered his plea of guilty in this case,

3    and again today, defendant stated that he believes that, "The

4    Koran obliges every able Muslim to participate in jihad and

5    fight in the way of Allah those who fight you, and kill them

6    wherever you find them, some parts of the Koran say, an eye for

7    an eye, a tooth for a tooth."

8           Defendant added that participation in jihad against

9    the United States is considered among the most virtuous deeds

10   in Islam and is highly encouraged in the Koran.  In explaining

11   his offense, defendant stated that, "I attempted to use an

12   explosive device which in the U.S. law is a weapon of mass

13   destruction which I call a blessed weapon."

14          Defendant has never expressed doubt or regret or

15   remorse about his mission.  To the contrary, he sees that

16   mission as divinely inspired and a continuing obligation.

17          Second factor is the need for the sentence to

18   reflect the seriousness of the offense, to promote respect for

19   the law and to provide just punishment for the offense.

20          And I think I commented sufficiently, perhaps, on

21   the seriousness of the offense and the need to promote respect

22   for the law, but I want to comment a little bit on "to provide

23   just punishment for the offense."  No charge in this case was a

24   capital offense.  The defendant does not face the death

25   penalty, he faces life in prison without parole.

2/16/2012 Sentencing Hearing

1              I want to read just a few sentences from an article

2    that recently appeared in the New Yorker by a reporter named

3    Adam Gopnik:

4              "A prison is a trap for catching time.  We hear a

5    fair amount about the inner life of the American prison, but

6    the catch is that American prison life is mostly undramatic.

7    The reported stories fail to grab us because, for the most

8    part, nothing happens.  One day in the life of a prisoner

9    serving a lengthy sentence is all we need to know about that

10   prisoner because the idea that anyone could live for a minute

11   in such circumstances seems impossible.  One day in the life of

12   an American prison means much less because the force of it is

13   that one day typically stretches out for decades.  It isn't the

14   horror of the time at hand but the unimaginable sameness of the

15   time ahead that makes prisons unendurable for their inmates.

16   The basic reality of American prisons is not that of the lock

17   and key, but that of the lock and clock.

18              "That's why no one who has been inside a prison, if

19   only for a day, can ever forget the feeling.  Time stops.  A

20   note of attenuated panic, of watchful paranoia, anxiety, and

21   boredom and fear mixed into a kind of enveloping fog.

22              "As a smart man once wrote after being locked up,

23   the thing about jail is that there are bars on the windows and

24   they won't let you out.  This simple truth governs all the

25   others.  What prisoners try to convey to the free is how the

1  presence of time as something being done to you instead of

2  something you do things with alters the mind at every moment.

3  Time becomes, in every sense, this thing you serve."

4         Mr. Abdulmutallab is 23, 24 years old now.  He has

5  only that to look forward to as life in prison, and it seems to

6  me that that is just punishment for what he has done.

7         The third factor is the need to protect the public

8  from further crimes of the defendant.  I believe that the

9  defendant poses a significant, ongoing threat to the safety of

10  American citizens everywhere.  I already recited some of the

11  things that he said when he pled guilty.  He stated that it is

12  his religious belief that the Koran obliges every able Muslim

13  to participate in jihad and fight in the way of Allah those who

14  fight you, and kill them wherever you find them, and that

15  participation in jihad against the United States is considered

16  among the most virtuous of deeds in Islam and is highly

17  encouraged in the Koran.

18         Thus, by his own words, defendant has shown that he

19  continues to desire to harm the United States and its citizens,

20  and that he views it as his religious obligation to do so.

21         I believe that defendant has stated and it is clear

22  that he has enormous motivation to carry out another terrorist

23  attack but that he lacks the capability of doing that because

24  of his incarceration.  This Court has no ability to control the

25  defendant's motivation, which does appear to be unchanged.

1   However, I can control defendant's opportunity to act on those

2   intentions.

3           The fourth factor is the need to provide defendant

4   with educational or vocational training and medical treatment.

5   I don't think any of those factors is applicable to this case,

6   and I think that the recitation of the factors that I've

7   already referred to probably adequately covers the statute.

8           I will acknowledge what Ms. Corken said, that the

9   maximum sentence has been imposed in other similar cases such

10  as the Richard Reid case.

11          So with all of that in mind, I sentence the

12  defendant as follows.

13          On Counts 1 through 8 of the first superseding

14  indictment, pursuant to the Sentencing Reform Act of 1984, the

15  Court, having considered the sentencing guidelines and factors

16  contained in 18 U.S.C. Section 3553(a) hereby commits the

17  defendant, Umar Farouk Abdulmutallab, to the custody of the

18  Bureau of Prisons for a term of 240 months on Counts 3, 5, and

19  8, to be served concurrently, and life on Count 7, to run

20  concurrent to the other three counts; to life on Count 1 to run

21  consecutive to all other counts; to 30 years on Count 2 to run

22  consecutive to all other counts; to life on Count 4 to run

23  consecutive to all other counts, and life on Count 6, to run

24  consecutive to all other counts.

25          And in case that isn't clear, that is the maximum

1    penalty that is permitted on each of the eight counts of the

2    indictment.

3              An $800 special assessment is ordered due

4    forthwith.  I incorporate in this sentence the order of

5    restitution that I indicated earlier.  The total amount of

6    restitution ordered in this case which will appear in the

7    judgment and commitment order is $2,105 to the, I think it's

8    nine persons who made such a claim.  That is Dior Adel, $400;

9    Jenny Adel, $400; Robert Digennaro, $88; Michelle

10   Dillemuth, $400; Anne Fernandez, $252; Geoffrey Howard, $165;

11   Annmarie Kamper $400, and Kris Lizaso, $400.  Interest is

12   waived on the restitution amounts.

13             The Court waives the imposition of a fine, the cost

14   of incarceration and the cost of supervision due to the

15   defendant's inability to pay.  Upon release from imprisonment,

16   which will never occur, but just for the record, defendant

17   shall be placed on supervised release for a period of life on

18   each count to run concurrent.

19             The mandatory drug testing condition is suspended

20   based on the Court's determination that the defendant poses a

21   low risk of future substance abuse.  If he ever is on

22   supervision, defendant shall abide by the standard conditions

23   adopted by the United States District Court for the Eastern

24   District of Michigan.

25             Mr. Abdulmutallab, I believe that you have the

                USA -v- Abdulmutallab    Case No. 10-CR-20005

1    right to appeal your sentence.  If you wish to appeal your

2    sentence, that needs to be done within ten days.

3            Are there any objections to the sentence just

4    pronounced that have not previously been raised?

5            MR. CHAMBERS:  No, Your Honor.

6            MR. TUKEL:  No, Your Honor.

7            THE COURT:  All right.  This hearing is concluded.

8            THE DEFENDANT:  Allahu Akbar.

9            THE CLERK:  All rise.  Court is in recess.

10            THE DEFENDANT:  Allahu Akbar.

11            (Proceedings concluded 3:05 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2/16/2012 Sentencing Hearing

1

2                          -   -   -

3              **C E R T I F I C A T I O N**

4         I, Suzanne Jacques, official court

5         reporter for the United States District

6         Court, Eastern District of Michigan,

7         Southern Division, appointed pursuant to

8         the provisions of Title 28, United States

9         Code, Section 753, do hereby certify that

10        the foregoing is a correct transcript of

11        the proceedings in the above-entitled

12        cause on the date hereinbefore set forth.

13        I do further certify that the foregoing

14        transcript has been prepared by me or

15        under my direction.

16   s/ Suzanne Jacques_____          2/15/12
     Suzanne Jacques                     Date
17    Official Court Reporter

18

19

20

21

22

23

24

25

              USA -v- Abdulmutallab    Case No. 10-CR-20005